463 F.2d 872
 79 L.R.R.M. (BNA) 3028, 150 U.S.App.D.C. 36,
68 Lab.Cas. P 12,611
 ALTON & SOUTHERN RAILWAY COMPANY et al.
v.
INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS,
Sheet Metal Workers' International Association,
Appellant, International Brotherhood of
Electrical Workers et al.
 No. 24217.
 United States Court of Appeals,
 District of Columbia Circuit.
 Argued Sept. 15, 1971.
Decided April 11, 1972.
 
 Mr. Michael H. Gottesman, Washington, D. C., with whom Messrs. George H. Cohen, Washington, D. C., and Donald W. Fisher, Toledo, Ohio, were on the brief, for appellants.
 Mr. Francis M. Shea, Washington, D. C., with whom Messrs. Richard T. Conway and Ralph J. Moore, Jr., Washington, D. C., were on the brief, for appellees.
 Messrs. Joseph L. Rauh, Jr., and John Silard, Washington, D. C., filed memoranda on behalf of the United Transportation Union, as amicus curiae.
 Before LEVENTHAL and WILKEY, Circuit Judges, and GOURLEY,* Senior District Judge for the Western District of Pennsylvania.
 LEVENTHAL, Circuit Judge:
 
 
 1
 This case is still another chapter in the volume of disputes--labor disputes and legal disputes--between carriers and unions. The carriers, plaintiffs and appellees, account for most of the nation's Class I railroads. They brought this action against four unions representing their shopcraft employees, and on March 2, 1970, the District Court granted the carriers a preliminary injunction restraining these unions from engaging in any whipsaw strike against an individual carrier over any dispute arising from notices served by the unions in November 1968 under Sec. 6 of the Railway Labor Act.[1] The Sheet Metal Workers Union appealed.[2] Appellee carriers contend on the merits that the District Court's order should be affirmed. The primary position of the carriers, however, is that the appeal should be dismissed as moot. We dismiss the appeal.
 
 
 2
 A. The District Court's Order of March 2, 1970 and Findings
 
 
 3
 The underlying facts, available at greater length in the District Court's opinion (supra note 1), may be stated briefly.
 
 
 4
 In November 1968 the four shopcraft unions--representing approximately 45,000 workers out of the 500,000 employees in the carriers' unionized work force--served notices under Sec. 6 of the Railway Labor Act ("Act"), 45 U.S.C. Sec. 156, proposing changes in wages. The carriers served notices proposing changes in work rules. In accordance with the unions' request, national bargaining began in March 1969. In April the parties jointly applied for the services of the National Mediation Board ("Board"), see 45 U.S.C. Sec. 155 First. Mediation likewise failed to produce agreement, and on September 3, 1969, after the unions declined arbitration, the Board relinquished jurisdiction of the dispute.
 
 
 5
 The unions served notice of intention to strike seven of the roads. The carriers announced that if any individual road were struck, they would shut down operations and lock out all employees. The Board notified the President, pursuant to Sec. 10 of the Act, 45 U.S.C. Sec. 160. On October 3, 1969, the President created Emergency Board No. 176 to investigate the dispute. This board made recommendations which the unions declined, and on November 2, 1969, it issued its report of failure to resolve the dispute. After maintaining the status quo for another thirty days, as required by 45 U.S.C. Sec. 160, and still another day, the representatives of the unions and carriers initialed a Memorandum of Understanding, dated December 4, 1969.
 
 
 6
 This settlement was conditioned on ratification by the membership of the shopcraft unions. The membership of three of the unions ratified, but the approximately 6,000 members of the Sheet Metal Workers balked at accepting a work rule that would permit members of one shopcraft union to perform "incidental" work in another craft.[3] Since the unions had agreed that none would accept unless all accepted, the agreement failed.
 
 
 7
 On Saturday, January 31, 1970, these events happened: At 12:01 a. m. the unions struck the Union Pacific Railroad. The carriers responded by announcing a nationwide cessation of operations to commence at 10 p. m. At 6:30 p. m. District Judge Sirica issued temporary restraining orders, enjoining both the strike (as requested by the carriers) and a nationwide lockout (as requested by the unions).[4]
 
 
 8
 The opinion accompanying the preliminary injunction of March 2, 1970, stated that the carriers had established sufficient probability of success on the merits, for an injunction to further the purposes of the Act. Judge Corcoran reasoned that selective strikes were illegal with respect to matters, like this one, which had been the subject of "national handling," and as to which national handling was obligatory under the Railway Labor Act, since a selective strike would have the likely effect of destroying such handling.[5]
 
 B. The Mootness of the Appeal
 
 9
 Events Subsequent to the Preliminary Injunction
 
 
 10
 The events subsequent to the District Court's order, brought before us by the carriers' motion to dismiss the appeal as moot, include these uncontroverted facts: The unions, enjoined from a selective strike, threatened a nation-wide strike, encompassing all carriers. On March 4, 1970, Congress enacted Public Law 91-203, which extended the status quo period mandated by Sec. 10 of the Act, and required the parties to maintain the status quo until midnight April 11, unless they bilaterally agreed to a change.
 
 
 11
 On April 9, 1970, the President signed into law Public Law 91-226, which provided: "That the memorandum of understanding, dated December 4, 1969, shall have the same effect (including the preclusion of resort to either strike or lockout) as though arrived at by agreement of the parties under the Railway Labor Act (45 U.S.C. 151 et seq.) and that February 19, 1970, shall be deemed the 'date of notification of ratification' as used in this memorandum of understanding."
 
 
 12
 The terms of the Memorandum of Understanding were implemented, including the payment of substantial wage increases, some retroactive to January 1, 1969, to the employees represented by the shopcraft unions.
 
 Expiration of the Injunction By Its Terms
 
 13
 It seems to be agreed that this appeal would have been rendered moot if, subsequent to the issuance of the order enjoining the strike, the employer and union had executed an agreement terminating the strike. In Local No. 8-6, Oil, Chemical & Atomic Workers Intern. Union v. Missouri, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960) the union protested the validity of a state law under the authority of which the governor took possession of a public utility beset by a strike, and the state court enjoined continuation of the strike. On appeal, the state supreme court noted that the injunction had expired by its own terms, but proceeded to sustain the constitutionality of the pertinent sections of the statute authorizing the seizure and prohibiting the strike. The Supreme Court held that to express an opinion on the merits of appellants' contentions "would disregard settled principles of judicial administration," and ignore a "basic limitation upon the duty and function of this court."
 
 
 14
 In the case at bar, the preliminary injunction restrained any selective strike "over any dispute arising from the Section 6 notices served on or about November 8 and November 29, 1968." Plainly, that judgment has expired by its terms. There is no possibility of a strike pursuant to the 1968 notices. Public Law 91-226 had the effect of requiring the unions to file a new notice under Sec. 6 of the Act, if they wanted to remove the "incidental work rule" provision set forth in the Memorandum, and mandated by the statute, for that became part of a new plateau of work rules binding on carriers and employees unless changed in accordance with the provisions of the Act. Brotherhood of R. Trainmen v. Akron & Barberton Belt R. Co., 128 U.S.App.D.C. 59, 71, 385 F.2d 581, 593 (1967), cert. denied, Brotherhood of Locomotive Firemen etc. v. Bangar and Aroostock R. Co., 390 U.S. 923, 88 S.Ct. 851, 856, 19 L.Ed.2d 983 (1968). As to this requirement of the Act, it makes no difference whether the work rules are adopted by voluntary agreement of the parties, or by mandate of an arbitration procedure consented by the parties, or by valid legislation specified to have the same effect as an agreement or arbitration.
 
 
 15
 However, the Union draws a sharp distinction between a settlement to which it has consented, which may be taken as canceling the dispute, and a settlement that has been imposed upon it, which only operates to defer the eruption of the dispute until the mandate is removed. This point requires further consideration.
 
 
 16
 General Doctrines of Mootness, At Common Law and Under the Constitution
 
 
 17
 The Union vigorously asserts that the carriers' contention that the labor dispute is moot is a "sterile, ultra-technical construction [that] runs counter realities of the instant labor relations situation, the need to insure that parties adversely affected by short term orders are accorded the opportunity to obtain judicial review thereof, the public interest in promptly resolving recurring issue of major legal import." The Union asserts that its hostility to the incidental work rule is implacable and enduring, and that under any "pragmatic standard of labor-management relations, the underlying economic dispute continues to fester."[6]
 
 
 18
 We may usefully preface our consideration of the Union's contention by identifying two separate domains of doctrine that are frequently jumbled in discussions of mootness.
 
 
 19
 Mootness begins as a doctrine that describes the practice of the courts of England and the colonies--long prior to the adoption of the Constitution. It identifies a common law rule, used also and indeed typically in the courts of chancery and the exchequer. It may be usefully referred to as a common law limitation on the duty of a court to decide cases presented. See Mills v. Green, 159 U.S. 651, 653-654, 16 S.Ct. 132, 40 L.Ed. 293 (1895).[7] In this aspect, it is primarily a doctrine of "judicial administration," as Justice Stewart put it in the Oil, Chemical & Atomic Workers opinion, supra, see 361 U.S. at 368, 80 S.Ct. 391, 4 L.Ed.2d 373.
 
 
 20
 Certain problems of mootness, however, have a constitutional dimension, under Article III of the Constitution. A Federal court is without power to decide a case that is moot to the extent of constitutional disability. Sibron v. New York, 392 U.S. 40, 57, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Liner v. Jafco, Inc., 375 U.S. 301, 306, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964). As Sibron indicates, an appeal is moot in the constitutional sense when it is "abstract, feigned or hypothetical," when it seeks an "advisory" opinion because it lacks the "impact of actuality," or when it lacks the concreteness and the kind of adversariness that is assured when a party has a "substantial stake" in the controversy which assures a presentation with requisite diligence, and, indeed, "fervor." Id. See also, Flast v. Cohen, 392 U.S. 83, 106, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).
 
 
 21
 We may assume, for present purposes, that the underlying adversariness of the parties before us, the existence of a controversy in the trial court that was concrete, real and immediate, and the persistence of elements of that controversy in the continuing relations of the parties, remove the case before us from a claim of constitutional disability in the appeal.
 
 
 22
 However, the constitutional power of a court to decide a contention presented on appeal does not define a constitutional duty. There is latitude in appellate courts to develop doctrines of judicial administration that permit a court to decline decision though not precluded by a jurisdictional bar from consideration of the matter, as appears from recent decisions on concurrent sentences, Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); United States v. Hooper, 139 U.S.App.D.C. 171, 432 F.2d 604 (1970).
 
 Expiration of Decree By Its Terms
 
 23
 When events during the pendency of the appeal have eliminated any possibility that the court's order may grant meaningful relief affecting the controversy that precipitated the litigation, applicable doctrine permits, and judicial administration generally calls for, dismissal of the appeal. The expiration of the decree by its terms is a familiar instance of this rule, as appears from the Oil Workers Union case, and others, e. g., Johnson-Kennedy Radio Corp. v. Chicago Bears Football Club, Inc., 97 F. 2d 223 (7th Cir. 1938). It was on this principle that a union sought dismissal of the appeal from, and vacation of, a District Court decree entered in an injunction suit, concerning the meaning of a collective bargaining agreement, because the agreement expired, by its own terms, after the appeal was docketed. General Electric Co. v. Local 761, Int'l U. of Electrical, Radio & Mach. Wkrs., 395 F.2d 891 (6th Cir. 1968). See, also, Shank v. NLRB and General Electric Co., 260 F.2d 444, 446 (7th Cir. 1958).
 
 
 24
 Certainly the appeal need not be decided because of the bare possibility of such future legal repercussion as estoppel of judgment, for the appellate court may readily prevent a judgment not subject to review "from spawning any legal consequences" by vacating the jugment of the trial court when ordering that the appeal be dismissed. United States v. Munsingwear, Inc., 340 U.S. 36, 41, 71 S.Ct. 104, 95 L.Ed. 36 (1950).
 
 
 25
 Recurrent Controversies In Cases of Public Interest
 
 
 26
 However, there is a strong counter-current of doctrine under which the court continues an appeal in existence, notwithstanding the lapse in time of the particular decree or controversy, when the court discerns a likelihood of recurrence of the same issue, generally in the framework of a "continuing" or "recurring" controversy, and "public interest" in maintaining the appeal. When state courts are involved, this doctrine is sometimes referred to as an "exception" to the rule for dismissal of appeals in cases that have become moot.[8] Federal courts, mindful of Article III implications, are inclined to analyze the issue in terms that avoid the use of the word "moot," by taking a broader view of the scope of the underlying controversy.
 
 
 27
 The seminal opinion, in modern jurisprudence, is Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), involving a suit to enjoin enforcement of an ICC order requiring the terminal company to cease and desist from granting an alleged undue preference for a two-year period. That period expired while the case was on appeal. The Court noted the general rule calling for dismissal of appeal if during its pendency something occurs which precludes the court from granting "effectual relief" to appellant. But it held the rule inapplicable, saying (p. 515, 31 S.Ct. p. 283):
 
 
 28
 In the case at bar the order of the Commission may to some extent (the exact extent it is unnecessary to define) be the basis of further proceedings. But there is a broader consideration. The question involved in the orders of the Interstate Commerce Commission are usually continuing (as are manifestly those in the case at bar), and these considerations ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review, and at one time the government, and at another time the carriers have their rights determined by the Commission without a chance of redress.
 
 
 29
 The likelihood of repetition of the controversy and the public interest in assuring appellate review are the key elements of the Southern Pacific Terminal doctrine.[9] The vitality of the Southern Pacific Terminal doctrine is undeniable.[10] Precedents abound, and we have identified some in the margin.[11] Indeed, if this doctrine identifies an "exception," the exception may have swallowed up the rule--at least where litigation involves actions by or against public officials, and the public interest in assuring enforcement of the legislative will and, of course, constitutional mandates. A cognate "public interest" has also led in recent years to the overhaul of doctrines on matters like standing and ripeness, and to the hearing of controversies from which the courts formerly refrained.[12]
 
 
 30
 We do not undertake to catalog or analyze in detail the cases on appellate consideration of recurrent controversies. The situations are necessarily variant, and the variables complex. It can be said, however, that when the particular controversy has expired, as when the decree has lapsed by its terms, and as a result the parties have no absolute right, and the court has no corresponding duty, to maintain the appeal, then the court's decision to maintain the appeal, in the interest of sound judicial administration, is dependent on a prediction of a recurrence or continuation of what is perceived to be essentially the same legal dispute. Without that ingredient, the Federal court will not entertain the appeal so as to advise the parties of what their rights would be in what is essentially a new legal controversy.[13]
 
 
 31
 While an "effective remedy" for the immediate dispute is not obligatory, there must be at least a capacity for a declaration of legal right concerning a future projection of the actual dispute that precipitated the litigation. The court will not decide a moot case on the sole ground of public importance, Amalgamated Association of Street etc. Employees Div. 998 v. Wisconsin Emp. Rel. Bd., 340 U.S. 416, 418, 71 S.Ct. 373, 95 L.Ed. 389 (1951). When the court views the public interest as greater a lesser possibility of repetition may suffice, Moore v. Ogilvie, supra. A decision that the case is so dead that the court totally lacks jurisdiction apparently requires a demonstration that there can be "no reasonable expectation" of reiteration of wrong. United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).
 
 
 32
 Latitude of Court in Cases Where Particular Controversy Has Terminated
 
 
 33
 It is not in derogation of the doctrine permitting disposition of a recurrent or continuing controversy but in an effort to define and secure its perceptive application that we conclude that sound principles of judicial administration point toward dismissal of the pending appeal.
 
 
 34
 Even where there is undoubted jurisdiction to entertain litigation, as in cases where the defendant relies on his discontinuance of the acts complained of,[14] there is doctrine to decline equitable relief in an appropriate case,[15] and to require a "cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."[16] The declaratory judgment action has enlarged the cases that may meaningfully be entertained by courts, assuming requisite personal stake and adversariness, Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Yet there is also latitude, under sound doctrine of judicial administration, to decline to entertain actions for declaratory judgments. Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); Public Affairs Associates v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962); Davis v. Ichord, 143 U.S.App.D.C. 183, 442 F.2d 1207, 1216 (1970) (concurring opinion). And it is settled doctrine that courts go further both to give and withhold relief in the light of consideration of public interest. Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937).
 
 
 35
 The doctrines relating to dismissal of appeal for reasons of sound judicial administration have not hitherto been cast in terms of judicial "discretion." But when the particular controversy has expired, so that there is no duty or obligation of the court to maintain the appeal, an application of the doctrine permitting maintenance of appeals of recurring controversies in cases of public interest necessarily identifies judicial latitude.
 
 
 36
 The scope of a court's latitude, and the significance of its assessment of the degrees of public interest and likelihood of recurrence of the underlying dispute, and the interplay of these factors, are illustrated by the Consumers Union and Green cases, both cited in note 11. Both cases involved an agency's change of position. In the Consumers Union case, the Veterans Administration changed its contract forms, so as to remove the contractual inhibition on availability of test data sought by plaintiff under the Freedom of Information Act, and entered into a stipulation in open court. The court deemed it "quite clear" that the Government's restrictions would not be reasserted, and the appeal was dismissed. In Green, the right of the Negro parents and children to avoid Federal tax exemption and deductions for segregated white schools was deemed to warrant retention of jurisdiction, even though the interpretation of the Internal Revenue Code considered likely enough to warrant a temporary preliminary injunction was subsequently accepted by the Treasury. The court held plaintiffs were entitled to relief "on an enduring, permanent basis, not on a basis that could be withdrawn with a shift in the tides of administration, or changing perceptions of sound discretion."
 
 
 37
 Reasons for Dismissing Appeal In the Case At Bar
 
 
 38
 Our judgment that the interest of sound judicial administration requires dismissal of the appeal at bar embraces the following considerations.
 
 
 39
 First, and perhaps foremost, the Federal courts must take account of the dangers posed by "freewheeling judicial interference in labor relations." Chicago & N. W. Ry. Co. v. United Transportation Union, 402 U.S. 570, 583, 91 S.Ct. 1731, 1738, 29 L.Ed.2d 187 (1971). This does not remove our duty, in appropriate cases, to enter decrees that mandate the duties of both carriers and their employees under the Railway Labor Act. But it bids us make certain that the case is truly ripe for ascertainment of the legal rights of these groups, refrain so far as possible from absolute principles bottomed on abstract and hypothetical predicates, and be mindful of the particular difficulties that confront a court's traverse of these fields of disputation, lacking as it does the aid of a tribunal with familiarity and expertise that may help detect the mines. See Delaware & Hudson Ry. Co. v. United Transportation Union, 146 U.S.App.D.C. 142, 450 F.2d 603, 617, 622, 629 (1971).
 
 
 40
 Second, we cannot assume that any future dispute over the "incidental work rule" will be merely a recurrence of the past dispute. It may, indeed, be that the same dispute will recur in the court as surely as a disc played another time on the phonograph, and perhaps with amplification of the volume of discord. But the passage of the law also opened up the possibility that actual experience under the incidental work rule would modify attitudes on both sides and mute both fears and hopes. Time has upset many fighting faiths, Justice Holmes once noted. It is one possible benefit of the Congressional interjections with statutes of limited duration, that both union and management will learn lessons from experience with interim rules enforced during the temporary period. Brotherhood of R. Trainmen v. Akron & Barberton Belt R. Co., 128 U.S.App.D.C. at 72-73, 385 F.2d at 594-595 (1968). This possibility is enhanced by the ability of Congress, duly noted in our Delaware & Hudson opinion (450 F.2d at 621), to do more than the courts can do, to go beyond the maintenance of the status quo ante and to provide a new framework.
 
 
 41
 The appellant's future course may also be influenced by (a) the possibility that a margin in favor of the rule may be provided by the 45% of its membership not previously interested enough to vote on the matter (see note 3, above), and (b) the circumstance that whereas in 1968-69 all four shopcraft unions which formed an Employees' Conference Committee undertook to withhold agreement if any union were dissatisfied, appellant's single-handed resistance to the incidental work rule led the other three shopcraft unions to offer to accept the Memorandum of Understanding despite appellant's refusal to ratify.[17]
 
 
 42
 Finally, even assuming there is a persistence of the factual dispute over the incidental work rule, that does not necessarily define a recurrence of the same legal controversy that precipitated the litigation in District Court. That controversy related to the validity of whipsaw strikes (supra, note 1). The parties had diametrically opposed legal positions on that issue. Whatever the differences of the past, it seems plausible to expect that each of the parties has modified its thinking and approach so as to take account of our 1971 opinion in the Delaware and Hudson case, supra.
 
 
 43
 This is not a case where the appellate court should maintain an appeal in the public interest because a decision of the trial court, though it will not be res judicata if vacated under the Munsingwear doctrine, nevertheless has consequences in terms of deprivation of a party's continuing rights because of the expectation and probability that officials will conform to the ruling. Carroll v. President and Com'rs of Princess Anne County, 393 U.S. 175, 178-179, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).
 
 
 44
 The parties and governmental officials have available not only Judge Corcoran's analysis but also our subsequent Delaware and Hudson opinion.
 
 
 45
 Moreover, the steps taken by the appellant union in the future may well take into account not only the Union's conclusion as to its rights under existing law, but also the possibility that its actions may affect the likelihood of generating pressure for changes in the law, whether along the lines proposed in the President's message of February 3, 1971,[18] or some other approach. We are not to be taken as speculating on what will happen, but rather as saying that there are so many variables in the situation that one cannot fairly identify a predictably recurring legal controversy, as predictable, say, as the return of the migratory geese and hunters discussed in Lansden, supra note 11.
 
 
 46
 The expiration of the decree appealed from means that the Union has no absolute right to maintenance of the appeal, and the court has no corresponding obligation to decide the appeal. Certainly any collateral dispute concerning costs does not establish such a right.[19]
 
 
 47
 The Union essentially appeals to our discretion, to our judgment as to what is appropriate in terms of sound judicial administration of appellate courts. There is more that could be said, but we have identified the principal considerations. The behavior of the parties might indeed be affected by our views on the merits, if we should issue such an opinion, but that is not necessarily a virtue.[20] If anything, courts refrain from advisory opinions. We do not deem it appropriate to ascertain and announce applicable legal principles, dependent as they are on the shape of specific factual contexts, before the facts have taken shape. Perhaps when and as the facts evolve, there will be no legal controversy of consequence. If there is such a controversy, it will likely be different from the one presented in 1970 to the District Court. There should be opportunity for the District Court to make findings and exercise its discretion in the circumstances. If necessary, the appellate court can provide expedited consideration.
 
 
 48
 The appeal will be dismissed for mootness,[21] and the case remanded to the District Court with directions to vacate the decree brought before us on appeal.
 
 
 49
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S. C. Sec. 294(d) (1964)
 
 
 [1]
 The District Court's opinion and its preliminary injunction are reported, Int'l Ass'n of Machinists & AW v. Nat'l Ry. Labor Conf., 310 F.Supp. 905. The term "whipsaw strike" is used in the order. The opinion states (at fn. 5): "A 'whipsaw strike', by common understanding, is a strike against only one member of a multi-employer bargaining unit in an attempt by the use of economic pressure to force that member and each subsequent member to come to an agreement separately."
 
 
 [2]
 No appeal was taken by the other three shopcraft unions: International Association of Machinists and Aerospace Workers, International Brotherhood of Electrical Workers; International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers
 
 
 [3]
 S.Rept. No. 91-758, 91st Cong., 2d Sess. (1970) at 3, states that 2,203 voted against the memorandum of understanding, and 1,267 voted for it
 
 
 [4]
 Int'l Ass'n of Machinists & A.W. v. Nat'l Ry. Labor Conf., D.C., 301 F.Supp. 904 (1970)
 
 
 [5]
 There was no appeal from that part of the order which denied, on ground of mootness, the unions' request for a preliminary injunction against the lockout
 
 
 [6]
 Appellant's opposition to the motion to dismiss refers to the unswerving opposition to the incidental work rule on the part of the membership of appellant Union, and the representations of the union officials that they would insist on removal of that rule in future notices under the Act. The Union cites the April 1970 testimony to the Senate Committee of its general vice president, John W. O'Brien: . . . We have [received] literally hundreds and hundreds of letters . . . which indicates the intense interest of our membership . . . They say, "Hang on there and fight to the end. We don't want that [incidental work] rule at $10 an hour or any other price." Hearings before the Senate Committee on Labor and Public Welfare on S.J.Res. 178, 91st Cong., 2nd Sess. (April 2, 1970) p. 101. Mr. O'Brien asserted that if the work rule were mandated this dispute "will be a red hot issue in our next contract." (p. 62) And Secretary of Labor George P. Shultz, testifying on April 2, for legislation to enact the memorandum of agreement for a temporary period, testified that "I see no greater prospect for a voluntary settlement of this dispute than I saw on March 4 when I recommended that the dispute be settled by legislation." (p. 2)
 
 
 [7]
 As Chief Justice Taney remarked in Lord v. Veazie, 8 How. [49 U.S.] 250, 254, 12 L.Ed. 1067 (1850) the office of a court of justice is to resolve disputes that cannot be reconciled by the parties to the dispute, and not to provide an opinion that a party desires to know for his own purposes. And its strict limitation is necessary to avoid the abuse that it may be led into an opinion adverse to a person not even before the court
 
 
 [8]
 Annot. "Public interest as ground for refusal to dismiss an appeal, where question has become moot, or dismissal is sought by one or both parties." 132 A.L.R. 1185, 1189 (1940). For the "exception" terminology, see e. g., Nat'l Elec. Contractors Ass'n v. Seattle School Dist., 66 Wash.2d 14, 19-20, 400 P.2d 778, 781-782 (1965), quoting Justice Schaefer in People ex rel. Wallace v. Labrenz, 411 Ill.2d 618, 104 N.E.2d 769, 772, 30 A.L.R. 2d 1132 (1952) ("well-recognized exception" applied in blood transfusion case)
 
 
 [9]
 The public interest in preventing an agency from avoiding review by making its orders of limited duration, was in effect analogized to the public interest in a judicial decree to preclude recurrence of violations of law by private persons. The Court cited United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 308, 17 S.Ct. 540, 41 L.Ed. 1007 (1897), where the Government appealed from a dimissal of its suit against carriers which had entered into an agreement and pending appeal the carriers entered into a voluntary dissolution of their association. The Court had there noted that the Government's action was not merely to dissolve the association but to obtain a judgment declaring the agreement invalid, and was an assertion of a right "as a substantial trustee for the public." The Court concluded that rights were of a "public character" whether the Government was party plaintiff or defendant. See 219 U.S. at 516, 31 S.Ct. 279, 55 L.Ed. 310
 
 
 [10]
 The doctrine and various cases are discussed in Mootness on Appeal in the Supreme Court, 83 Harv.L.Rev. 1672 (1970); Mootness and Ripeness: The Postman Always Rings Twice, 65 Colum. L.Rev. 867 (1965); Disposition of Moot Cases by the United States Supreme Court, 23 U.Chi.L.Rev. 77 (1955); Diamond, Federal Jurisdiction to Decide Moot Cases, 94 U.Pa.L.Rev. 125 (1946)
 
 
 [11]
 Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); Green v. Connally, 330 F.Supp. 1150, 1170 (D.C., 3-judge court, 1971), aff'd sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971); Friend v. United States, 128 U.S.App.D.C. 323, 388 F.2d 579 (1967); Women Strike for Peace v. Hickel, 137 U.S.App.D.C. 29, 36, 420 F.2d 597, 604 (1969); Matthews v. Hardy, 137 U.S.App.D.C. 39, 45, 420 F.2d 607, 613 (1969); Jeannette Rankin Brigade v. Chief of Capitol Police, 137 U.S. App.D.C. 155, 157, 421 F.2d 1090, 1092 (1969); Consumers Union v. Veterans Admin., 436 F.2d 1363 (2d Cir. 1971); Lansden v. Hart, 180 F.2d 679 (7th Cir.), cert. denied, 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 606 (1950)
 
 
 [12]
 National Automatic Laundry and Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 443 F.2d 689 (1971)
 
 
 [13]
 Care must be taken in regard to the comment quoted in Southern Pacific Terminal (see 219 U.S. at 516, 31 S.Ct. 279, 55 L.Ed. 310) from Boise City Irr. & Land Co. v. Clark, 131 F. 415 (9th Cir. 1904), where the court in maintaining an appeal concerning a water-rate ordinance that had expired stated that one reason for decision of such cases lay in "the necessity of propriety of deciding some question of law presented which might serve to guide the municipal body when again called upon to act in the matter."
 The courts do not give advisory opinions to government agencies any more than to private parties. A distinction is meaningful only in terms of the circumstance that a deliberate and persistent official interpretation is more likely to identify a "recurring controversy" situation.
 
 
 [14]
 E. g., United States v. Trans-Missouri Freight Ass'n, supra note 9; United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); FTC v. Goodyear Tire & Rubber Co., 304 U.S. 257, 260, 58 S.Ct. 863, 82 L.Ed. 1326 (1938)
 
 
 [15]
 Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944)
 However even when the court denies injunctive relief, in the light of a good faith effort at compliance, it may retain jurisdiction to assure continued implementation of legal requirements. Parham v. Southwestern Bell Tel. Co., 433 F.2d 421, 429 (8th Cir. 1970).
 
 
 [16]
 United States v. W. T. Grant, Co., supra note 14, 345 U.S. at 633, 73 S.Ct. at 898
 
 
 [17]
 See 310 F.Supp. at 909, fn. 2
 
 
 [18]
 See 117 Cong.Rec. S. 744 (daily ed. Feb. 3, 1971): "Emergency Public Interest Protection Act." This report was called for by Public Law 91-541
 
 
 [19]
 Heitmuller v. Stokes, 256 U.S. 359, 362, 41 S.Ct. 522, 65 L.Ed. 990 (1921); Wingert v. First National Bank, 223 U.S. 670, 672, 32 S.Ct. 391, 56 L.Ed. 605 (1912)
 
 
 [20]
 Chicago & N. W. Ry. v. UTU, 402 U.S. at 583, 91 S.Ct. 1731, 29 L.Ed.2d 187
 
 
 [21]
 It is convenient to use the generic term of dismissal "for mootness," without regard to whether what is involved is common law mootness, accompanied by an absence of reason for retention, or constitutional mootness that imposes a complete jurisdictional bar