Robert **ROBINSON**, Appellant,

v.

Charles **M. RODGERS** et al.

No. 71-1017.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 19, 1792.

Decided June 29, 1973.

Theodore A. Shmanda, Washington, D. C., with whom Ronald J. Wilson, Washington, D. C. (appointed by the District Court) was on the brief, for appellant.

Barry W. Levine, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry, and Harvey S. Price, Asst. U. S. Attys., were on the brief for appellee.

Before WRIGHT, McGOWAN and LEVENTHAL, Circuit Judges.

**LEVENTHAL, Circuit Judge:**

This is an appeal from an order dismissing a habeas corpus petition. We dismiss the appeal on the ground that it has become moot, and that there is no occasion to invoke the public interest exception for important questions of recurring interest.

By a two-count indictment filed February 12, 1969, in Criminal Case No. 216–69, appellant was charged with violation of the federal narcotics laws, 26 U.S.C. § 4704 and 21 U.S.C. § 174. On June 10, 1970, District Judge Robinson ordered appellant civilly committed to the custody of the Surgeon General for a period not to exceed thirty-six months pursuant to Title I of the Narcotic Addict Rehabilitation Act of 1966 (NARA), 28 U.S.C. § 2902. The commitment being in lieu of prosecution, it was further ordered that the charges against appellant were to be held in abeyance.

Appellant was placed in the Clinical Research Center, Lexington, Kentucky, for treatment of his narcotic addiction. By letter to Judge Robinson dated September 11, 1970, Dr. Harold Conrad, Associate Director of the Division of Narcotic Addiction and Drug Abuse and Director of the Lexington facility (for the Surgeon General), requested termination of appellant's NARA commitment since appellant had "proven unable to adjust to the program" and could "no longer be treated as a medical problem under Title I." In accordance with the mandatory provisions of 28 U.S.C. § 2902(c), Judge Robinson on September 21, 1970, ordered that appellant's commitment be terminated and that he be returned to the District of Columbia for further proceedings in regard to the abeyant criminal charges pending against him. Appellant was returned to the D.C. Jail.

On October 22, 1970, he filed, through counsel, a petition for a writ of habeas corpus, in which he alleged that he was denied due process of law by virtue of the procedure followed at the Lexington facility when his commitment was terminated, and prayed for reinstatement into the facility. On November 17, 1970, upon consideration both of appellant's petition and the respondents' return and answer to the rule to show cause, District Judge McGuire dismissed the petition. It is from that order dismissing the habeas corpus petition that the instant appeal is taken.

In the interim, however, to dispose of the reactivated charges against him in the pending criminal case, appellant on December 3, 1970, entered a plea of guilty before Judge Robinson to the misdemeanor of illegal possession of narcotics, 33 D.C.Code § 402. He was immediately released on his personal recognizance. On April 29, 1971, appellant was sentenced by Judge Robinson to a term of imprisonment of one year; execution of that sentence was suspended, and appellant was placed on probation for a period of four months.[1] At the same time, upon oral motion by the Government, the indictment in Crim. No. 216–70 was dismissed.

It appears from the foregoing that the appeal has been rendered moot, at least under customary doctrines of mootness, by appellant's plea of guilty, which meant he was no longer eligible for Title I commitment.

A commitment under Title I of NARA, by its own language, is a commitment in lieu of prosecution. Unlike Title II (18 U.S.C. §§ 4251–4255), it does not apply to those convicted under an indictment. Appellant pleaded guilty in Crim. No. 2143–70 to dispose of the indictment in Crim. No. 216–69. In so doing he became ineligible for Title I

---

1. Prior to the imposition of sentence appellant had already spent more than one year in custody, thus exceeding the maximum term of imprisonment which could be meted for the misdemeanor to which he pleaded guilty. Consequently, appellant was entitled to credit for the time he had served in confinement. 18 U.S.C. § 3568; 28 U.S.C. § 2903(d).

consideration: he could not be committed in lieu of prosecution.[2]

■■ Appellant argues that the appeal is not moot since he may have suffered adverse collateral consequences by virtue of his transfer from Lexington to the District of Columbia Jail. The "collateral consequences" doctrine has wide scope for application in criminal cases. As the Supreme Court said in Sibron v. New York, 392 U.S. 40, 57, 88 S.Ct. 1889, 1900, 20 L.Ed.2d 917 (1969), a "criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed." This is judicial recognition of the wide-ranging impact of a criminal conviction, in many more ways than are encompassed by the actual judgment and sentence. The collateral legal consequences doctrine applies even where the proceeding is said to be civil in nature, but embraces a determination that the person involved has engaged in anti-social activity or presents a danger to society. Justin v. Jacobs, 145 U.S.App.D.C. 355, 449 F.2d 1017 (1971). See also In re Ballay, 482 F.2d 648 (1973), holding that an appeal from an order for commitment of an allegedly mentally ill person in a hospital could be maintained, although the patient had subsequently been discharged, and that proof of mental illness and dangerousness in involuntary civil commitment proceedings must be beyond a reasonable doubt rather than by a preponderance of the evidence.

The collateral legal consequences doctrine is salutary, to avoid a withdrawal from the courts of governmental actions that have discernible and substantial consequences to the individual affected. This wholesome doctrine would be damaged if pushed to unsound extremes. While we do not say that a Surgeon General determination that an individual has proven unable to adjust to a NARA program is completely devoid of consequences other than those of the resulting transfer, we discern no legal consequences of the kind developed in Sibron and its progeny.

■ Appellant projects a prospect of mischievous consequences by saying that in view of the high rate of recidivism among narcotic addicts, he may again request or become eligible for NARA treatment, and in that case he will or may be haunted by the records in the files of the Surgeon General, the Attorney General and the District Court. This line of argument seems to us too speculative and remote to warrant retention of the appeal. The doctrines of common law mootness are available in the Federal courts, even in cases that are not moot in the constitutional sense, to decline decisions on matters where no legal consequences will be spawned by dismissal of the appeal. Alton & So. Ry. Co. v. International Ass'n of Mach. & A. W., 150 U.S.App.D.C. 36, 463 F.2d 872, 876 et seq. (1972).

A problem that would persevere for appellant, even on his theory, is that even if a declaratory judgment were provided, though not prayed in the habeas corpus petition, and it were ruled that the removal from NARA was invalid because procedurally defective, the underlying record of his actions and attitude at Lexington would remain. Appellant implicitly recognizes this in the reply brief, by adding on a reference to relief through expungement of records. But this is not a mere adjunct prayer automatically available if the transfer is invalid for procedural reasons, but a different and far more complex and sensitive claim for relief. We do not necessarily stand on procedural ceremony when there is an important interest to be served, but we discern none such in the case before us.

So far as the interest of appellant is concerned, if he is in earnest to cure his addiction he has available to him an ap-

---

2. In addition, having been placed on probation, appellant is specifically excluded from the scope of Title I. 28 U.S.C. § 2901(g)(3).

plication for consideration under local community treatment programs which may be more appropriate for his condition than NARA commitment.[3] Even as to NARA, a one-time non-cooperation does not necessarily bind a subsequent appraisal, and the legislature and judiciary have recognized expanding treatment options available under NARA.[4]

Expungement as an instrument of justice is another doctrine accorded latitude for appropriate cases,[5] but its proper scope requires reflection and definition. If it is to be given application in the setting of this case, it had best be done in a proceeding brought against the officials responsible for the action taken, and brought in their venue.[6]

Finally, we consider whether the appeal should be retained because the underlying issues relate to recurring questions of public importance. This, too, is a doctrine that embodies an exception of importance to the general mootness rule. Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911); In re Ballay, *supra*; Alton & So. Ry. v. International Ass'n of Mach. & A. W., *supra*; Friend v. United States, 128 U.S.App.D.C. 323, 388 F.2d 579 (1967). But we do not think it fairly applicable to the case before us.

The question on the merits that appellant seeks to have adjudicated in this case is whether the Constitution was violated in the procedure followed at the Lexington facility prior to the determination that appellant can no longer be treated as a medical problem, and the submission to the court that his Title I NARA commitment be terminated. Appellant claims this rests on certain assumptions of misconduct, particularly in certain incidents of September 10, 1970, which were referred to in the Public Health Service September 11, 1970 Memorandum for the record which accompanied the letter written to the court that day by Dr. Conrad. Appellant claims that as to these incidents he is entitled to a "due process type hearing," that he was informed of Dr. Conrad's decision to drop him from the NARA program after the decision had been made; that he was not notified of the charges in advance, and never provided an opportunity to be heard, to rebut the charges or to participate in any kind of hearing. The Government responds that appellant is in error in assuming that he was dropped from the program solely on the basis of the incidents of September 10, 1970; that his previous arrogant attitude and defiant behavior at the Center had been the subject of discussion between him and both the Center Staff and fellow residents; that appellant was well aware that his adjustment at the Center was substantially less than satis-

---

3. See United States v. Raymond Moore, Slip Opinion No. 71–1252 (D.C.Cir. May 14, 1973) at 132 ff. (Opinion of Judge Leventhal, Part V, concurred in by Chief Judge Bazelon and Judge McGowan).

4. *Id.* at pp. 65 et seq., 72 et seq., 132 et seq.

5. Peters v. Hobby, 349 U.S. 331, 348–349, 75 S.Ct. 790, 99 L.Ed. 1129 (1955); Sullivan v. Murphy, 155 U.S.App.D.C. 28, 478 F.2d 938 (1973) at 53 ff; Newell v. Ignatius, 132 U.S.App.D.C. 252, 407 F.2d 715 (1969), The history of *Newell* is discussed in Finley v. Hampton, 154 U.S.App.D.C. 50, 473 F.2d 180, 187–188 (1972).

6. Appellant's habeas corpus action was brought against Mr. Rodgers, Superintendent of Jail, as the person holding him in custody, see 28 U.S.C. § 2242. Appellant also named Dr. Conrad as a defendant. The Government argues that this was improper, but we hesitate, at least on first reflection, to follow this path, for naming Dr. Conrad as a party, even though he had no present custody, at least had the virtue of naming the official claimed to have undertaken the "illegal" action that resulted in the unlawful custody. *Compare* Northeast Constr. Co. v. Romney, 485 F.2d 752, at 760–762 (1973). However, we need not refine this procedural point, or possible problems of jurisdiction over the person and venue. In any event, this was clearly not brought as a case for expungement of records.

factory and was causing concern to the responsible medical authorities in charge; that as to the September 10 incidents, appellant formally discussed his degree of participation with his fellow ward members and with his Unit Chief; that appellant neither professed innocence nor asked to speak to Dr. Conrad; that several days elapsed prior to his departure from the Lexington facility, on September 22, 1970, during which appellant, though explicitly advised of the possibility of appeal and encouraged to seek local available legal aid, did nothing.

If it were necessary to resolve the divergences in these accounts, this court would remand for a hearing. But to the extent that the public interest is concerned with whether there is an ongoing procedure at the Lexington facility of the Public Health Service, it is satisfied by the filing by the Government, at the request of the court, of a supplementary memorandum describing the procedures in effect. That memorandum transmits a letter communication from Dr. Conrad to Government counsel, reproduced as Appendix A. This is not extra-record material received for purposes of resolution of the facts. We do not either find as a fact that these procedures are in existence, or determine their adequacy as a matter of law. We refer to this supplementary communication only as supportive of our conclusion that there is no general disposition at the facility to dispense with considerations of fairness to the patient. In general, the issue of procedural fairness must take into account the kinds of questions involved and the alternative available. If and when it becomes necessary to determine whether minimum fairness is satisfied, that can be done in the light of a focused proceeding that will air the problem fully. The representation made to the court is sufficient, we think, to make it clear that the public interest does not now demand enlargement of this proceeding to embrace a prayer for expungement on records.

Appeal dismissed.

## APPENDIX A

Department of Health, Education, and Welfare
Public Health Service
Health Services and Mental Health Administration
June 20, 1972

Barry Levine, Asst. U. S. Attorney
Criminal Division, U. S. Court House
Constitution & 3rd. Street, N.W.
Washington, D.C. 20001

Dear Mr. Levine:

Enclosed are statements from each of our four separate treatment units here at the Clinical Research Center which outline the procedures which they utilize prior to recommending to the courts that a NARA patient be dropped from the civil commitment program.

Each treatment unit is organized as a therapeutic community, and in this type of setting if any error is made it is made in the direction of over-communication, with multiple meetings, group therapy sessions, confrontation sessions, "town hall" sessions, etc., going on throughout each week.

To my knowledge, patients are not ordinarily recommended for discharge from the NARA program on the basis of a single incident, although this is theoretically possible; the usual course of events is a long series of situations during which the patient has demonstrated repeatedly in many different settings on the unit that he himself is not only grossly lacking in motivation but that he also represents a real threat to the integrity of the treatment unit, thus jeopardizing the meaningfulness of the program to his fellow residents.

I myself personally review the recommendations of the treatment unit prior

to approving them and forwarding them to the courts. In complicated cases this review may take the form of conferences with the unit staff, discussions with the Chiefs of all the units, and, if requested, meeting with the involved patients. Every case, however, does not necessarily involve all of these actions.

In addition, every patient in the program here has regular free access to legal aid provided by the senior law students and faculty of the University of Kentucky College of Law. Further, a public telephone is available for any resident who wishes to make a long distance call, outgoing mail is not censored in any form, and incoming mail is not censored in content but only opened to detect possible contraband material.

It is our feeling, therefore, that we do give detailed consideration to the rights of all patients in the treatment program, and that, to the best of our knowledge, we do not deny anyone an opportunity for due process.

If I can be of any further assistance to you in this regard or if there are any questions I have left unanswered please do not hesitate to contact me.

Sincerely,

Harold T. Conrad, M.D.
Chief
Clinical Research Center

P.S.

Although the attached memoranda reflect current practices at the Clinical Research Center, they do not reflect procedural methods significantly different from those in effect at the time of Mr. Robinson's case. The Center has always held that the introduction of contraband, physical violence and threats of physical violence were violations of "cardinal rules" which would in all probability lead to a recommendation for dismissal. The same opportunities for indepth discussions with both other patients and staff members at several levels of authority were also present at the time of Mr. Robinson's difficulties.