**Peter J. FINLEY, Appellant,**

v.

**Robert E. HAMPTON et al.**

**No. 71-1063.**

*United States Court of Appeals, District of Columbia Circuit.*

Argued April 24, 1972.

Decided Dec. 22, 1972.

---

**8.** United States ex rel. Checkman v. Laird, *supra* note 4; *cf.* Ng Fung Ho v. White, 259 U.S. 276, 285, 42 S.Ct. 492, 66 L.Ed. 938 (1922).

Mr. John F. Graybeal, Washington, D. C., for appellant.

Mrs. Lee Berger Anderson, Atty., Dept. of Justice, with whom Mr. Robert L. Keuch, Atty., Dept. of Justice, was on the brief, for appellees.

Before WRIGHT, LEVENTHAL and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

Appellant Finley brought an action against appellees—the members of the Civil Service Commission (CSC) and George Romney, Secretary of the Department of Housing and Urban Development (HUD)—seeking certain declaratory relief and, *inter alia,* expungement of a portion of the investigative files of the Commission and HUD. The District Court granted the appellees' motion for summary judgment and dismissed the complaint.

## I. *Facts; and District Court Proceedings*

Mr. Finley was employed on October 25, 1965, by the Federal Housing Administration (FHA), now a part of HUD. His position, Employee Relations Specialist, Employee Relations and Security Section, Personnel Division, was not then classed as security "sensitive," but on November 22, 1965, the head of FHA designated it "sensitive." For three years previous to his employment by FHA, Finley had been employed at McGuire Air Force Base in New Jersey, in a position designated "sensitive," and held an Air Force security clearance at the level "secret." However, § 3(b) of Executive Order (Ex.O.) 10450 (April 27, 1953), as amended,[1] requires that "any position so designated [as sensitive] shall be filled or occupied only by a person with respect to whom a full field investigation has been conducted," and it made every agency head responsible for establishing a program to insure that employment and retention of any civilian employee be "clearly consistent with the interests of the national security." The FHA accordingly requested the CSC to conduct a full-field investigation (FFI). This was completed in late March 1966, and the CSC furnished the investigative report to HUD.

A few days later, Finley's supervisor[2] approached him, stating he had the results of the FFI and wished to discuss them with Finley. This superior informed Finley that the FFI had uncovered witnesses who reported that two of his associates had "homosexual mannerisms." In Finley's account, this conversation came after his work load fell off, and he was paid "just to sit there" without any work. Finley described the encounter as follows:

> [H]e said to me, "the investigation report reveals that two of your

1. Ex.O. 10450 as issued appears at 18 Fed. Reg. 2489 (1953), and as amended at 5 U.S.C. (1970 ed.) following § 7311.

2. The record is confusing as to the identity of this superior. The Government's brief identifies him as Ray McKnew, now deceased, then Chief of the Employee Relations and Security Section. McKnew's duties included responsibility as Deputy Personnel Security Officer, with authority to clear FHA personnel for sensitive positions, FHA regs. 200.105(c). Finley's brief does not refer to this superior by name. The record contains correspondence in which the superior is sometimes identified as Mr. McKnew (App. I:37) and other times as Mr. Donald Hanson, Mr. McKnew's assistant (e. g., App. I:42). In the District Court, Finley's counsel referred to the superior as Mr. Hanson (App. I:48). The record contains an indication that Mr. McKnew had been detailed to a different program in FHA but "physically remained in our office" (App. I:42), while Mr. Hanson served as acting Chief of Section.

friends have homosexual mannerisms." I asked [the supervisor] to explain his remarks, but he only said to me, "We know the kind of person you are. Come on now, confess, who are these people?" Then he began to berate me. Things worsened after this incident.

The Government does not contradict Finley's account of the confrontation, but refers to it as an opportunity provided to him pursuant to Instruction 62 of the Federal Personnel Manual:

A person being considered for a sensitive position should have, whenever appropriate, an opportunity to explain or refute derogatory security information developed in an investigation before being rejected or nonselected on security grounds. Otherwise, persons may be unjustly rejected or nonselected on security grounds because of mistaken identity or because certain mitigating circumstances were not known to the prospective employing agency.

The record shows that, subsequent to the meeting with his superior, Finley filed a statement under oath with respect to the witness' disclosures; but it does not set forth the content of that statement.

On June 15, 1966, some 2½ months after completion of the FFI, the FHA Commissioner "requested that the sensitive designation be removed" from Finley's position.[3] The next day, FHA's Personnel Security Officer "determined that [Finley] is granted clearance for a non-sensitive position."[4]

Shortly thereafter, Finley commenced a series of unavailing efforts, personally and through counsel, to discover the exact nature and sources of the information on the mannerisms of his friends. These efforts included correspondence with Congressmen and Senators and, in the Executive Branch, with the President and with various officials in FHA, HUD and the Civil Service Commission. He also sought unsuccessfully for relief through the FHA grievance appeal process. He was denied an appeal on the ground that he had not suffered pay or grade impairment, suspension or removal, and hence was not the subject of "adverse action" for purposes of the grievance appeal process, see 5 C.F.R. § 772.-301.

Finley's complaint prayed (a) an order directing HUD and the CSC to expunge the (allegedly) derogatory material from his files (HUD personnel file and CSC investigative file); (b) a declaration that he was eligible for a "secret" clearance insofar as such (allegedly) derogatory information is concerned; or (c) an order directing defendants to

---

3. Ex.O. 10450 provides, § 3(b) that. each agency head shall designate as a sensitive position any position within his agency "the occupant of which could bring about, by virtue of the nature of the position, a material adverse effect on the national security."

The response to plaintiff's interrogatories states the reason for the redesignation was "the Agency's determination, based upon the work experience of the Agency from November 1965 to the date of the change, that access to classified information was not essential to the performance of the incumbent's work" (App. I :26).

4. We are not enlightened as to just what role the Security Officer plays in the determination of employee fitness for non-sensitive positions. Ex.O. 10450, § 8(a) (1) (iii), apparently contemplates security

disqualification on the basis of "Any criminal, infamous, dishonest, immoral or notoriously disgraceful conduct . . . or sexual perversion." Civil Service Commission regulations, 5 CFR § 731.201(b), formerly 5 CFR § 2.106(3), provide a general basis for removal of employees from the competitive service for

"criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the government."

As to disqualification for homosexuality, see Dew v. Halaby, 115 U.S.App.D.C. 171, 317 F.2d 582 (1963), cert. granted, 376 U.S. 904, 84 S.Ct. 671, 11 L.Ed.2d 605, dismissed per stipulation of the parties, 379 U.S. 951, 85 S.Ct. 452, 13 L. Ed.2d 550 (1964). Cf. Norton v. Macy, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969).

grant a hearing at which he could cross-examine those who supplied the information on his friends' mannerisms. On appeal he has limited himself to a claim for expungement.

The District Judge, while agreeing that the information given by unnamed witnesses pertaining to the mannerisms of Finley's friends could not lawfully be made the basis for adverse action,[5] granted summary judgment dismissing the complaint on the ground that Finley could not base a claim merely on the existence in the investigative file of comments received during the full-field investigation; and since Finley had not suffered a grade or pay impairment [6]— and indeed has received several promotions since the incident with his superior—the court concluded he had not suffered injury from any action taken by the Government.[7]

## II. *Applicable Legal Doctrine*

■ We agree with the District Court that plaintiff has not shown any cognizable legal injury.

Dismissal of plaintiff's case is responsive to the

"established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action. . . ."

See Laird v. Tatum, 408 U.S. 1, 13, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972), dismissing a claim that plaintiffs' First Amendment rights were violated by the maintenance of an Army data-gathering system, which plaintiffs challenged as involving the surveillance of lawful civilian political activity. There is constraint upon the courts both from the constitutional requirement of a justiciable case or controversy [8] and from the limitations appropriate to the exercise of a court's equitable powers.[9] It is particularly apposite in circumstances, like the present case, where the present injury, if any, is ephemeral in nature and the prospect of future harm is remote and speculative.

We take up, *seriatim,* the various bases that Finley advances for the maintenance of his lawsuit.

---

5. See colloquy at App. I:52:
Plaintiff's counsel said:
We submit that the information is so patently defective that any such action which the Government might take with respect to plaintiff based on that information would be constitutionally invalid.
The Court replied:
If they take some action based on it, I think you may well be right but, if they don't take any action on it, what do we do?

6. The Government has relied on 5 C.F.R. Part 752 and 5 C.F.R. § 772.301, which provide for appeal to the Civil Service Commission in cases of "adverse action" —such as removal, suspension, furlough without pay, and reduction in rank or grade.

7. See also App. I:55:
The Court: The information as related is pure silly, just silly.
Judge Hart concluded (App. I:64) by stating that summary judgment would be granted to the Government, since:

under the circumstances of this case it [has not been] shown in any way that Mr. Finley has been denied any rights by reason of this information . . . .
I may say this by way of dictum, should it ever come before me that a man is denied any right he was entitled [to] because of this type of information, I would act very quickly to the contrary.

8. Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) ; United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). *See* Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–241, 57 S.Ct. 461, 81 L.Ed. 617 (1937). *Cf.* Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971).

9. See, e. g., Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) ; Rescue Army v. Municipal Court, 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947) ; Davis v. Ichord, 143 U.S.App. D.C. 183, 192, 442 F.2d 1207, 1216 (1970) (Leventhal, J., concurring).

■ 1. Finley contends that the gathering and retention of information concerning his acquaintances and their mannerisms has a "chilling effect" upon the exercise of his right to freedom of association.[10] "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm. . . . " Laird v. Tatum, *supra*, at 13–14, 92 S.Ct. at 2325. See also, United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (cited with approval in Laird v. Tatum); Davis v. Ichord, 143 U.S.App. D.C. 183, 442 F.2d 1207 (1970). Thus, to present a justiciable controversy, it must be shown that the asserted inhibition upon the exercise of constitutional rights arises in the context of an extant or imminently threatened governmental sanction.[11] And the question remains whether Finley has done so.

■ 2. Finley may be unhappy about the presence in his file of adverse and perhaps untrue comments by persons interviewed, even though he cannot establish concretely the possible consequences of these comments. But the court cannot strike such material from his file, or take any action, in the ab-sence of a real threat of injury in the form of a Government action or a finding on the basis of such material.[12] There is no allegation that the data were unlawfully acquired. When the plaintiff sought federal employment he impliedly consented that Government investigators interview others concerning him.

3. Given the existence in the investigative file of the comments of the persons interviewed, the disclosure to Finley did not constitute either legal harm or a basis for judicial intervention. If anything, such disclosure to an employee is an advantage, giving him the benefit of knowing what is in his file, for good or ill, enabling him to adduce such matters as he considers pertinent in rebuttal, and putting him on the alert to discern adverse action in the future. This may be subject to a psychological offset of unease and concern, but the law cannot assume that a Government employee would rather be an ostrich.

4. Finley alleges he suffered injury when his position was declassified upon completion of the FFI. The fact remains, however, that he was not separated from employment or demoted. Indeed, he was thereafter promoted on at least two occasions.[13]

---

10. To this effect appellant cites United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Bates v. City of Little Rock, 361 U.S. 516, 80 S. Ct. 412, 4 L.Ed.2d 480 (1960); N. A. A. C. P. v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

11. Examples of such actions and sanctions appear in N. A. A. C. P. v. Alabama, *supra*, (contempt citation); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (criminal prosecution); Baird v. State Bar, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971) (exclusion from profession); Nat'l Student Ass'n v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d 1103 (1969) (threat of conscription). See also 408 U.S. at 11–12, 92 S. Ct. 2318, 33 L.Ed.2d 154 and cases therein cited.

12. We do not think retention of a lawful investigation report in the security file becomes the subject of a justiciable controversy because of the pesky problem that some of its contents may generate gossip. Finley claims that the "evidence" developed by the FFI unleased a flurry of gossip in his office with the result that he became the subject of harassment by his fellow employees. The District Judge commented: "The things that get whispered around places, things that get whispered around this courthouse are stupid." (App. I:56).

The alleged harassment from fellow workers may reflect the employee's hypersensitivity in the wake of the disclosure made to him, but even assuming that it resulted from unauthorized leakage from the investigative file of statements made by witnesses who were interviewed during the FFI, that consequence, though regrettable, is some extent probably inevitable and does not by itself constitute harm warranting action against senior governmental officers, at least in the absence of a claim of complicity in or other culpability for the leakage.

13. Finley's personnel file, as of November 26, 1969 (date of answer to plaintiff's interrogatories), documents his steady

Finley does not contend that either his original position at HUD or any subsequent HUD position, including that held when the complaint was filed (Deputy Chief, Career Development and Training Branch, Personnel Division of the Federal Housing Administration), were in fact "sensitive". When the appropriate Government official reconsidered whether a security classification and clearance was appropriate and decided that the position was not security sensitive, the Government had no need to evaluate the information allegedly concerning plaintiff's friends or to determine whether this would block a security clearance or require a further investigation before a security clearance could be granted. This is simply not the same, either in form or substance, as the denial of a security clearance. It is rather a reasonable conclusion by a responsible official that the agency's earlier decision to classify the position had been unwarranted. The action taken in rectifying this error carries no stigma for the plaintiff. He may assert, truthfully as to the spirit as well as the letter, that he has never been denied a security clearance.

The record before us contains a statement of HUD's Deputy Assistant Secretary for Administration: "There is no record in said folder [plaintiff's official personnel folder] or file [investigative file] of any 'adverse action' having been recommended, suggested or proposed with respect to plaintiff." [14]

We have considered the suggestion that, even though Finley cannot directly invoke the procedure provided by statute (5 U.S.C. § 7532) and regulation in the event of suspension or removal taken in the interest of national security, the court should vindicate his right to a hearing on the declassification of Finley's position because it may be considered tantamount to the denial of a security clearance.

Confronted with such a claim, the courts must focus on the effect of a security clearance, or its denial in a concrete context, and not abstractly. The critical importance of this approach is underscored by a comparison of Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) with Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Both of these cases involved civilian employees of defense contractors who were dismissed after loyalty investigations resulted in adverse findings. In *Greene*, the Court interpreted the relevant Executive Order so as to prohibit the revocation of a security clearance in the absence of an adequate hearing procedure; while the decision is technically one of statutory construction, the Court strongly intimated that a contrary result would run afoul of the due process clause, 360 U.S. at 496–497, 507–508, 79 S.Ct. 1400. In *Cafeteria Workers*, on the other hand, the Court held that the Constitution did not preclude denial of a security clearance, which summarily barred an employee from access to a naval installation, without benefit of either notice or a hearing. As the Court saw it, the distinction between the two cases lay in the impact that the denial of a security clearance had on the respective employees' ability to earn a livelihood. Greene had been an aeronautical engineer. Following his discharge, he had been effectively barred from employment in any sphere of the aero-space industry and was forced to eke out a living—at greatly reduced salary—as an architectural draftsman. Mrs. Brawner, whose exclusion from the Naval Gun Factory premises was upheld in *Cafeteria Workers*, was a short-order cook. Her employment at a defense installation had been merely in-

progress from the grade of GS–11, step 4 (1965) to GS–11, step 5 (11/5/67); GS–12, step 2 (6/30/68); GS–12, step 3 (6/29/69) and GS–13 (10/19/69). (App. I:24).

14. Answer of November 26, 1969, to plaintiff's interrogatory number 5(D). (App. I:23).

cidental, and the Court found that her transfer to a snack bar located in less sensitive environs did not appreciably detract from her earnings or her convenience. What emerges from these cases is the principle that the courts will, in considering whether there is a case for judicial intervention, examine the practical impact upon the employee of the holding or denial of a security clearance.

Finley has made no showing that the declassification action had any impact upon him. He has suffered no loss of pay, seniority, grade, or like tangible benefit. He makes no claim that access to classified documents is now or ever was required by the nature of his position in HUD. The positions he has held and now holds at HUD, both originally and after two promotions, are of middle-level responsibility in the civil service. No claim has been made that the lack of a security clearance in any way hampers or restricts him in the discharge of these responsibilities.

█ 5. This brings us to the possibility that the information contained in Finley's security file may be used at some future date to foreclose his opportunities. Implicit in this argument are two premises, and to prevail the appellant must establish both of them.

He must first show threatened injury —at least that some official might be inclined to take action merely on the basis of the comments that led to this lawsuit. District Judge Hart dismissed this as a substantial possibility:

> The information as related is pure silly, just silly. Why anybody would pay attention to it all . . . I don't know.

While Judge Hart's observation is sound as far as it goes, the fact that officials should not take action on the basis of such information does not mean that they will not, and it is to gain such assurance that plaintiff seeks judicial relief. Middle-level bureaucrats may react to this kind of information out of an excess of timidity. Even higher level officers declined to dismiss the comments of the informants as valueless.[15] However, they did not go so far as to say that the information was a reasonable predicate for any personnel action. And we have no basis, other than pure speculation, to conclude that material like the "mannerisms" statements, unsupported by additional and significant material, would actually be made the basis of an adverse personnel decision by a Government official.

More significantly, we have no basis other than speculation to discern the possible shape of future circumstances that would bring about an actual threat of prejudicial action to Finley's detriment. There is no evidence or tender that the ability to obtain a security clearance has or is likely to have any practical value to a man in Finley's position. The Government asserts that HUD is in the process of declassifying positions for which a "sensitive" designation is no longer necessary or appropriate. For all that appears, Finley's natural course of advancement in HUD, in accordance with his capabilities, may lie wholly outside the realm of classified jobs. Finley does not allege that he is now in fact seeking or planning to seek a classified position. The prospect of Finley's suffering harm by being refused nomination to a sensitive position is, therefore, doubly remote.

█ This is not a case where the threat to the Government employee has been made concrete by a denial of a security clearance, or by some finding doubting his loyalty. That is a cardinal point in the case before us, and one which distinguishes Newell v. Ignatius, 132 U.

---

15. In a letter to Congressman Frank Thompson of New Jersey concerning this controversy, a Civil Service Commissioner stated that the information developed in the FFI was "derogatory." (App. I:30). A more oblique reference in a letter from the CSC's General Counsel to Senator Sam Ervin of North Carolina recounts that the FFI had disclosed "witnesses who were of the opinion that Mr. Finley had questionable associates." (App. I:40).

S.App.D.C. 252, 407 F.2d 715 (1969). Newell brought an action for declaratory and injunctive relief, alleging that while he was a college student the Navy had disenrolled him from the Naval Reserve Officers Candidate Program "because he was characterized by Navy officials as 'disloyal'." He sought an order invalidating the disenrollment and expunging from his naval records any statement impugning his loyalty or security status. The District Court dismissed for lack of jurisdiction. Plaintiff sought summary reversal in order that the references in his record might be deleted by the time of his entry into the civilian job market. While this court denied that motion, except to the extent it provided an expedited briefing and argument schedule, it made provision for some immediate relief, after taking note of the following: (a) The "harsh impact such statements could have on appellant's future". (b) The Deputy Under Secretary's advice to Newell's counsel, subsequent to the references by Navy officers that troubled plaintiff, "Seaman Newell's loyalty is not questioned. * * *" [T]here is no basis to allege that Seaman Newell is a security risk."[16] This court called for a statement by the Navy concerning the actions taken to expunge from its records all references to Newell's "disloyalty" or "security." The Navy duly reported on the physical expungement from Newell's records of the documents containing references by Navy officers, not merely comments by outsiders to Navy investigators.[17]

When this court, by order of February 25, 1969, granted appellant's motion to dismiss the appeal, the court noted that defendants had expunged from the Navy's records the disenrollment order, "and have also expunged the Navy's files which stated or implied that any of the beliefs, associates, and opinions of appellant Newell referred to in said disenrollment order suggested doubt as to his loyalty to the United States." Finding that this expungement protected Newell "from any adverse effect of the said documents on his civilian employment opportunities," the court dismissed the appeal as moot.[18]

Finley's file does not contain any determination or assertion by Government personnel concerning plaintiff or his fitness to continue in federal employ; it merely records what others had said to Government investigators. The information has never been given a hallmark of significance. In *Newell*, on the other

16. This court also characterized the Government's position in the District Court as asserting that the disenrollment did not rest on findings as to loyalty or security.

17. Statement filed with this court February 3, 1969, listing two letters in 1966 and 1967, from Chief Naval Personnel to Commandant, 8th Naval District; a 1967 letter from Mr. Newell to Chief of Naval Personnel, on which there had been endorsements by C.O.NRSD, and Commandant, 8th Naval District, 1966 letter from Chief of Naval Personnel; and "Headquarters Eighth Naval District Administrative Remarks."

The Government's motion in the District Court to dismiss for lack of jurisdiction identified some of the contents of the foregoing. The Chief of Naval Personnel's 1966 letter stated, *inter alia:* "In view of [plaintiff's] admitted activities, associates and expressed opinions, serious question is raised as to his ability to perform in the capacity of a Naval Officer. Therefore, he is hereby disenrolled from the Reserve Officer Candidate Program due to inaptitude." The 1967 memorandum of the Commandant, 8th Naval District, forwarding Newell's request for reconsideration with a recommendation of disapproval, stated, *inter alia*: "Recent associations by [Newell] have raised questions concerning his loyalty and devotion to duty as a future Naval Officer."

18. *Compare* Taylor v. McElroy, 360 U.S. 709, 711, 79 S.Ct. 1428, 1429, 3 L.Ed. 2d 1528 (1959):

In view of the fact that petitioner has received clearance, the ultimate relief which he demanded, and in view of the representations of the Solicitor General to the effect that petitioner stands in precisely the same position as all others who have been granted clearance, that the evidence in petitioner's file will not be used against him in the future, and that the findings against petitioner have been expunged, this case is moot.

hand, the court had before it references by Navy officials made in the course of appraisals of applicant.

We summarize our appraisal of Finley's case by beginning with the axiom that any rights of a Government employee or applicant must be founded on a Congressional statute, expressly or by fair implication, Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), or a constitutional imperative. Congress has given substantial procedural protection to Government employees who are separated or demoted, and this protection extends to adverse personnel actions taken on security grounds, see 5 U.S.C. § 7532(c). We do not think this extends to a managerial action like the declassification of a position as sensitive in the absence of a claim that this was merely a disguise for an adverse action, like a transfer, demotion, or denial of security clearance directed against the employee personally, or a showing that it operated with the practical impact of denying a security clearance and in fact foreclosing or curtailing employment opportunities. We discern no right to demand the expungement of lawfully acquired information merely because of the speculative possibility that it might be given unwarranted emphasis under some hypothetical future state of facts. Nor can we discern the shape of a legal right to demand, in effect, that a security hearing be held in order to "clear" the record against any possibility of such adverse consequences. Courts do not resolve hypothetical controversies or render advisory opinions; and when there is no showing of a security sensitive position, in being or in prospect, the courts cannot build on a speculative possibility of harm to require the Executive Department to convene a "moot court" to appraise all or part of the employee's file. This, we think, is the clear implication of the authoritative jurisprudence that governs this court. Laird v. Tatum, supra.

Affirmed.

J. SKELLY WRIGHT, Circuit Judge, dissenting:

Having been a member of the panel of this court in Newell v. Ignatius, 132 U.S.App.D.C. 252, 407 F.2d 715 (1969), I must respectfully dissent. In *Newell* an enlisted man on active duty in the United States Naval Reserve brought suit to have expunged from his naval records statements "impugning his loyalty or security status." 132 U.S.App.D.C. at 253, 407 F.2d at 716. After dismissal of his action by the District Court, in this court he argued that since he was soon to leave the Navy, these references in his military record might adversely affect his opportunities in the civilian job market. The Navy admitted that the statements were in his Navy file, but stated further: "Seaman Newell's loyalty is not questioned. * * * [T]here is no basis to allege that Seaman Newell is a security risk." 132 U.S.App.D.C. at 254, 407 F.2d at 717.

On the basis of that record, and approaching the matter pragmatically, this court made the following ruling:

"From this statement of the Navy Department and from the representation of the Government at argument, we conclude that the Navy is fully prepared and willing, if indeed it has not already done so, to take all necessary actions to expunge all references which in any way allude to 'disloyalty' or 'security.' We therefore accept the Government's representation that these steps will be consummated forthwith if that has not already been done; Government counsel will promptly confirm these representations by appropriate communication to this court.

"So ordered."

*Ibid.* In due course the Government counsel confirmed that all the objectionable references had been physically expunged from Newell's military record.

In *Newell* appellant initially sought, not only expungement of the adverse references in his file, but also a court

order invalidating his disenrollment from the Naval Reserve Officer Candidate Program. As here with respect to appellant's failure to obtain security clearance, the Navy in *Newell* assured the court that the adverse information in the file was unrelated to Newell's disenrollment from the Program. Nevertheless, the court ordered the Navy to expunge the adverse information from Newell's record. I think we should do the same thing here.

With the *Newell*[1] precedent before them, why appellees here refuse to expunge the silly (except to silly people) statements[2] in suit from appellant's record is a mystery to me, unless, of course, appellees intend to use them again against appellant in the event he is ever considered again for a job requiring security clearance. If this is the reason for the apparent bureaucratic intransigence, and the Government's brief on appeal clearly so indicates,[3] then the harm to appellant is obvious and continuing. The questioned statements not only denied him a security clearance at the inception of this litigation;[4] they preclude the reasonable possibility that he will ever even be considered for a job requiring security clearance as long as he is in Government service. Thus appellant's case is significantly stronger than that of the employee of the Government contractor in Greene v. McElroy, 360 U.S. 474, 79 S. Ct. 1400, 3 L.Ed.2d 1377 (1959).[5] Ap-

---

1. The Government attempts to distinguish *Newell*, stating in its brief, p. 21, that this "court ordered the Navy to expunge baseless references to appellant's loyalty from naval records" because "there was no showing that the naval record was required to be 'maintained in confidence.'" The question of maintaining Newell's naval records in confidence was not an issue in the case. Moreover, anyone who has been around government any length of time knows how "confidential" derogatory personnel records are, particularly where the employee is in effect charged with being a homosexual.

2. The statements were to the effect that two of appellant's friends "have homosexual mannerisms."

3. The Government argues that the gathering of the type of information in suit is specifically authorized. Its Brief at p. 11 states:

    " * * * The information consists of statements of persons who were of the opinion that some of plaintiff's associates appeared to them to have mannerisms which are often those associated with persons who are homosexual or who appear to be homosexual. Of course, this information is clearly relevant to the investigative criteria of Section 8(a)(1)(iii) of Executive Order 10450, to wit: 'Any . . . infamous . . . immoral or notoriously disgraceful conduct . . . or sexual perversion.'"

    The Government also argues that the information must be maintained for future use. At pp. 16–17 the Government brief reads:

    "Thus, we see that Section 9(c) of Executive Order 10450 *requires* the physical retention of the investigative material concerning plaintiff. The interest of the government in preserving such information is apparent. * * * If a future clearance were sought there would be delay, and also the investigation might be thwarted by reason of the fact that persons interviewed concerning him previously were no longer available, and persons having information *favorable* [or unfavorable] to him might not be available."
    (Emphasis in original.)

4. The Government piously argues that the homosexual information in his file was not responsible for denying appellant security clearance. According to its brief, pp. 14–15, it appears that after considering the information it was decided by the Secretary that appellant's job did not require security clearance after all. An inference, perhaps nearer to the truth, would be that the Secretary did not have either the nerve or the stomach to fire him on the basis of this information so he redesignated appellant's job as nonsensitive.

5. The Court in *Greene* did not rest its decision on constitutional grounds. It held that the Secretary had no authority from the President or Congress to deny Greene security clearance which cost him his job "in a proceeding in which he was not afforded the safeguards of confrontation and crossexamination." 360 U.S. at 508, 79 S.Ct. at 1420. Even the substantial due process accorded Green was insufficient. Here appellant had no hearing;

pellant here is a career Government employee, whereas Greene was a private employee working on a Government contract. At the very least, as in *Greene*, appellant is entitled to an appropriate hearing. The nearest he came to a hearing here was a confrontation with his supervisor who berated him: "We know the kind of person you are. Come on now, confess, who are these people?"

Expunging the objectionable statements here will not, as the Government suggests, open all the dossiers being kept on Government employees to inspection by the Government employees concerned, and thus stimulate an avalanche of lawsuits designed to have objectionable file information expunged. The objectionable material in appellant's file surfaced because it resulted in his being denied security clearance. Appellant did not even know of the information until he in effect was charged by his supervisor with being a homosexual.

I respectfully dissent.

he was not told who his accusers were or even which of his friends were allegedly homosexual. He was merely told by his supervisor, acting, we are advised by the Government, not as his supervisor but as "Chief of the Employee Relations and Security Section—Deputy Personnel Security Officer," that he should confess and name his homosexual friends.