**Ida REICHERT and Ludlow Education Association, Plaintiffs,**

**v.**

**Jon E. DRAUD, Robert Taylor, Ronald Jones, Ralph Lillard, and Board of Education of Ludlow, Ky., Defendants.**

Civ. A. No. 80–81.

United States District Court,
E. D. Kentucky,
Covington Division.

April 15, 1981.

---

Arthur L. Brooks, Lexington, Ky., for plaintiffs.

Robert E. Ruberg, O'Hara, Ruberg, Osborne & Taylor, William Bubenzer, Covington, Ky., Philip P. Durand, Ambrose, Wilson & Grimm, Knoxville, Tenn., for defendants.

## OPINION

BERTELSMAN, District Judge.

This action by a teacher, who claims that her teaching schedule was changed in retaliation for her exercise of First Amendment rights, presents the court with a constitutional issue for which there is no exact precedent.

The facts of this controversy are somewhat complex. The court tried the case for four days without a jury, and issued an oral opinion containing extremely detailed findings of fact, which, while necessary for the disposition of the particular case, would be needlessly prolix for the purposes of this opinion. Therefore, the facts will be stated here in a highly condensed fashion. So summarized, these facts are as follows:

## FACTS

The plaintiff Ida Reichert is a public schoolteacher certified to teach political science, history, and English. She has taught at the Ludlow High School, the only high school in the Ludlow, Kentucky public school system, for at least 17 years, and perhaps longer. In any event she taught an elective psychology course for the 17 years, in addition to her English courses. She was not, however, certified in psychology.

For several years Mrs. Reichert has also served as President of the Ludlow Educational Association (LEA), which is a component of the Kentucky Educational Association (KEA). This association has no legal standing as a labor organization, but is a voluntary association of teachers. It does in fact negotiate with the Board of Education on various matters of interest to teachers. The Ludlow School System has between 500 and 600 students, and approximately 50 teachers are employed in the school system.

In February of 1980, an extremely heated controversy arose between LEA and certain individual member teachers on the one hand and the defendants, Ludlow Board of Education, Dr. Jon Draud, school superintendent, Robert Taylor, high school principal, and Ronald Jones and Ralph Lillard, individual board members, on the other hand.

LEA and the teachers contended that the administrators and the two named board members were using their official position in attempts to secure favoritism for their children. These charges were hotly denied, and acrimonious debate concerning them ensued at the board meetings of February, March, and April, 1980. In particular, charges were made that Jones and Lillard were personally harassing a teacher who had awarded an "F" in conduct to Lillard's daughter. Charges were also made that Jones' daughter had been permitted to participate in the preceding year's graduation ceremony, although she did not have sufficient credits and other students who had received a comparable number of credits were not permitted to do so.

Prior to the March meeting, the plaintiff, who was president of LEA, prepared and released to the press a letter summarizing LEA's side of the controversy. In order to give the reader a feel for the intensity of the hostilities, this letter is set forth in full in the margin.[1] The administration and

---

1. "Dear Dr. Draud and Members of the Board: "We request the L.E.A. resolution submitted to the Board at the February, 1980 meeting, which stated: 'No member of the Ludlow Board of Education shall be permitted to use the office to which he was elected in an unethical manner or as a means to secure personal privileges for himself or others' be adopted forbidding the specific actions listed below:

"1. There shall be no discriminatory action taken against a teacher as a result of that teacher's having a Board Member's child in class. (Reference here is made to Lettie Hamm's F conduct grade issued to Mr. Lillard's daughter. During the first semester of

board members were particularly upset by this letter because of the unfavorable publicity which it brought upon the school system, and because it brought Jones' family into the conflict.

On April 30, 1980, plaintiff was called into the office of defendant Taylor, high school principal, and informed that one class on her schedule for the following year was being changed from psychology to eighth-grade English. The reason given was that a reduction in the teaching staff required changes in the schedules of several teachers. This was the only course change Taylor announced for plaintiff, and the court found after hearing lengthy testimony on the matter the only one that was intended by the administration at that time, and the only one proximately resulting from plaintiff's First Amendment activity, although plaintiff also complained herein of other schedule changes that were subsequently announced.[2]

## ISSUE PRESENTED

■ Therefore, the court is squarely presented with the constitutional issue: Is a single schedule change actionable if there is no reduction in rank, actual or potential loss of pay, or any formally adverse personnel action, if the change is motivated by a desire to retaliate against a public employee for exercise of First Amendment rights?

This court finds that there was no satisfactory proof that this single course change

this school year, members of the high school staff issued 85 grades of F in conduct. Yet, Lettie Hamm was the only teacher placed in a defensive position because of the issuing of the F to Mr. Lillard's daughter.)

"2. No Board Member's child shall be granted privileges that are, at the same time, denied to other children within the school district. (Reference here is made to the graduation this past June of Mr. Jones' daughter, who contrary to the Board rules, was allowed to graduate while lacking the required subjects of English and social studies and who was also permitted, contrary to Board rules, to step forward and receive her diploma folder in the same manner as the other graduates who had completed their requirements. Since the graduation candidates who lacked one credit or less had to sit at the back of the class and were not permitted to step forward for recognition and would not have been seated there at all if they had lacked more than one credit, we believe the treatment accorded these students and their parents to be unfair and discriminatory.)

"Respectfully submitted,
"LUDLOW EDUCATION ASSOCIATION
"Ida Reichert, President"

**2.** With regard to other schedule changes the court found as follows: Mrs. Reichert informed Taylor at the interview of April 30th that she had used this psychology course in enhancing her success as coach of the speech and drama team, which had participated successfully in many local and state-wide competitions and achieved an outstanding record over the years. Mrs. Reichert told Taylor that teaching the psychology class brought her into contact with bright students, whom she was then able to recruit for the speech and drama team, and that she used projects in the psychology class to help the students achieve poise, research skills, and other qualities that contributed to success in the speech and drama competitions. Taylor said he saw no connection between the psychology class and the speech and drama activities.

The plaintiff returned to her classroom and within 15 minutes returned to Taylor's office with her resignation as speech and drama coach. He told her at that time that other schedule changes would be required if she persisted in this resignation, and asked her to reconsider. It was customary for the speech and drama coach to teach a class in speech and drama. Therefore, if plaintiff resigned as speech and drama coach, other schedule changes to reschedule this class would be required.

Plaintiff was asked by Mr. Taylor, Dr. Draud, the superintendent, and the Board of Education, itself, to reconsider her resignation as speech and drama coach.' When she refused to do so, a new speech and drama teacher and coach was hired, and further changes in the schedule were made. In May, these further changes, as they affected plaintiff, were announced to her. They included assigning her a seventh-grade homeroom which she had not had before, and giving her an eighth-grade history course, even though she had not taught history for several years.

The court found, however, that these latter changes were not the proximate result of First Amendment activity, but caused by the plaintiff's resignation as speech and drama coach. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

would result in a chilling effect[3] on free speech among teachers in the school system, and that, therefore, there was no actionable First Amendment violation and that the complaint must be dismissed.

## ANALYSIS

■ There is no doubt that plaintiff's representation of the members of her teachers' association at the board meetings, in the press, and in private conferences with the administrators, was protected First Amendment activity.[4] There is also no doubt that the transfer from the psychology course was personally distressing to the plaintiff, because it was her favorite course and she had been teaching it for 17 years. The plaintiff failed to show, however, that there was anything objectively demeaning or adverse in this one schedule change.[5]

### Lack of Binding Precedent

The Supreme Court of the United States has never addressed this precise issue. As far as the research of the parties herein, or that of this court, has disclosed, the closest

decision of the Supreme Court is *Perry v. Sindermann,*[6] where it held that "even though a person has no right to a valuable government benefit," he may not be deprived of such a benefit "on a basis that infringes his constitutionally protected interest—especially his interest in freedom of speech."

*Perry* was a decision which expanded the rights of public employees to sue their supervisors or the government for violation of First Amendment rights. The point the Court made in that decision was that it was not necessary that the teacher in that case have tenure in order to sue, but only that he be denied a "valuable government benefit" (in that case a denial of a grant of tenure). The decision cannot, therefore, be read as holding that a *sine qua non* exists for a public employee's First Amendment action, such as a showing of an actual or potential pecuniary loss.[7] Nevertheless, the Court's use of the term "valuable government benefit" as opposed to some more comprehensive term is not without significance.

**3.** Plaintiff alleges that defendants' actions had a "chilling effect" on the exercise of her First Amendment rights. The term "chill" was first used in this context by Justice Frankfurter in his concurring opinion in *Wieman v. Updegraff,* 344 U.S. 183, 195, 73 S.Ct. 215, 220, 97 L.Ed. 216 (1952). In objecting to a state action which would force teachers to take a loyalty oath, Justice Frankfurter said such unwarranted inhibitions upon the free spirit of teachers affects not only those who are immediately before the court. "It has an unmistakable tendency to chill that free play of spirit which all teachers ought especially to cultivate and practice ..." This segment of Justice Frankfurter's opinion was cited with approval in *Shelton v. Tucker,* 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960).

More recent cases apply this same concept to stand for the proposition that the state may not, directly or indirectly, inhibit one's right to free speech. "If the government could deny a benefit to a person because of constitutionally protected speech or association his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sinderman,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). "This would allow the government to produce a result which it could not command directly." *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958).

**4.** It was squarely so held in *Columbus Education Association v. Columbus City School District,* 623 F.2d 1155 (6th Cir. 1980).

**5.** The change was made together with changes in the schedules of four or five other teachers, and was from a subject in which plaintiff was not certified to a subject in which she was certified. Also it had been announced before the controversy arose that a reduction in force was going to be required, which would inevitably involve some changes in teachers' schedules.

**6.** 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

**7.** *Bernasconi v. Tempe Elementary School District,* 548 F.2d 857 (9th Cir. 1977). The Court's due process cases speak in terms of the public employee's showing deprivation of legitimate expectations based on state law. *See Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). *Perry* itself makes clear that such a requirement is inapplicable where a First Amendment deprivation is claimed, however. *See also Columbus Education Association v. Columbus City School District,* 623 F.2d 1155 (6th Cir. 1980); *Bernasconi, supra.*

What then is the test to be employed? Is there a threshold requirement of proof of objective harm which the public employee must cross to bring an action for deprivation of First Amendment rights, or is a mere subjective detriment sufficient if it proximately results from the First Amendment activity? Without ever squarely deciding the issue, various federal appellate and district courts appear to be philosophically at variance on the question.

In *Bernasconi v. Tempe Elementary School District*,[8] the court held that a retaliatory transfer to an affluent Anglo high school of a teacher, whose entire professional orientation was in teaching disadvantaged Spanish students, was actionable. The Court emphasized the invidious intent of the administration in making the transfer, and implied that, given such intent, even a subjectively detrimental personnel action would be actionable, unless perhaps it was *de minimis*.

In *Lemons v. Morgan*,[9] the Eighth Circuit held that a transfer in a teacher's assignment without loss of pay could be actionable where the teacher alleged that it amounted to a "demotion." Because the decision turned on the pleadings, it is of little help as a precedent.

In other cases, a permanent reassignment to a different physical location of work has been held or assumed to be actionable.[10] These cases also are not too helpful, because it is obvious that when a person criticizes the administration one day and is gone the next, the chilling effect on free speech would be much greater than a single course change in the schedule of a high school teacher who teaches five different classes a day.

The United States Court of Appeals for the Sixth Circuit has held that an invidiously motivated letter of reprimand placed in a teacher's file in retaliation for First Amendment activities, is actionable.[11] However, it is obvious that a letter of reprimand would be generally regarded as an adverse personnel action, which would involve a potential pecuniary loss. This is not true of the single course change involved here.

It is the duty of this court, then, to determine the proper resolution of the issue with which it is squarely presented, that is, whether a public employee such as the plaintiff, must meet some objective or substantial threshold requirement as a condition of bringing an action based on alleged deprivation of First Amendment rights.

### Conflicting Interests Involved

The opposing thrust of potent conflicting values must be synthesized in resolving this issue.

On the one hand, the First Amendment is the fundament of our constitutional system. Without the values preserved by the First Amendment, our nation would lose its essential character. Ideally, no one should be constrained, even in the slightest degree or by a purely subjective or indirect constraint, from the full exercise of his freedom of speech, or political association.[12]

It is folk wisdom that an accumulation of straws can fracture the camel's back. There is no doubt that an ingenious administrator could with a pattern of petty personnel actions harass out of public employ-

---

8. *Supra*, note 7.

9. 629 F.2d 1389 (8th Cir. 1980).

10. *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir. 1977) (involved loss of a title and certain pecuniary benefits); *Simpson v. Weeks*, 570 F.2d 240 (8th Cir. 1978) (transfer of policeman to duty in city jail accompanied by declining evaluation ratings); *Bernasconi v. Tempe Elementary School District*, 548 F.2d 857 (9th Cir. 1977) (discussed *supra*); *Perry v. Golub*, 400 F.Supp. 409 (N.D.Ala.1975) (involved move to a different city). *See also*

*Acanfora v. Board of Education of Montgomery County*, 491 F.2d 498 (4th Cir. 1974) (transfer from teaching to non-teaching position assumed, without discussion, to be actionable).

11. *Columbus Education Association v. Columbus City School District*, 623 F.2d 1155 (6th Cir. 1980).

12. *Wieman v. Updegraff*, 344 U.S. 183, 192, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952) (Black, J., concurring).

ment subordinates critical of his performance or policies, thus surreptitiously depriving them of the valued First Amendment rights protected by our Constitution. It is necessary to protect public employees from retaliation for "whistle blowing" and legitimate criticism of official performance and policies.[13] Otherwise, placidity and a reluctance to make waves will become the primary criteria for advancement in a career as a civil servant.

Since the founding of our nation, government has become virtually all-pervading in the daily lives of our people. A substantial portion of the population is employed by it. The thought that so many citizens would be able to express their views only at the risk of their livelihoods is intolerable.[14]

The central problem in constitutional law today is how to preserve each individual citizen's dignity as a human being as against a ubiquitous government,[15] without paralyzing that government's legitimate need to govern. Such an attempt is a noble experiment indeed—unprecedented in the annals of human history. The courts have struggled with this problem in the context of procedural due process and arrived at a balance that seems workable although certainly not perfect.[16] The problem is identical in the context of the First Amendment.[17]

The First Amendment cannot be construed in a vacuum. It must be read in context with the remainder of the bill of rights and the Constitution as a whole.

It must be recalled that principles of federalism and separation of powers are also an integral part of our Constitution, as is apparent from the structure of the document. A leading scholar has stated that the device of dividing power between the branches of the federal government and separating powers between the federal government and the states is one of the seven principal means by which our Constitution protects individual liberty.[18] The Tenth Amendment demonstrates that the bill of rights was not intended to inject the federal government into the day to day operations of state government.[19] The framers of our Constitution may well have considered it a greater threat to liberty for an arm of the federal government to be reviewing the assignments of daily tasks to employees of the states by their supervisors, than that a teacher be required to accept one or two undesirable classes on her schedule, especially if they are only subjectively undesirable.[20] We tend to forget that the threat to liberty the framers feared most was an undue concentration of power in the national government.[21]

Also, we tend to forget that a constitution, like any other law, must be construed

**13.** *See Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

**14.** *Cf. Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (political "spoils system" violates right of free association).

**15.** L. Tribe, American Constitutional Law Ch. 15 (1978).

**16.** *See* Ely, Democracy and Distrust 19 (1980).

**17.** "The problem in any case is to arrive at 'a *balance* between the interest of the teacher, as a citizen in commenting upon matters of public concern, and the interest of the state, as employer, in promoting the efficiency of public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

**18.** Tribe, *supra* note 15, Ch. 1. *See Moorman v. Wood*, 504 F.Supp. 467, 471 (E.D.Ky.1980).

**19.** U. S. Constitution, Amendment X reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

**20.** "The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees." *Wood v. Strickland*, 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975). *See also Bright v. Nunn*, 448 F.2d 245, 249 (6th Cir. 1971); *Petrey v. Flaugher*, 505 F.Supp. 1087 (E.D.Ky.1981).

**21.** *The Federalist* Nos. 45, 46.

in the light of common sense and practical limitations inherent in human nature, such as the inability of courts to read minds.

Although visionaries and revolutionaries, the drafters of the Constitution were eminently practical people, as demonstrated by the eminently practical document they devised. The administrators of a school system make a host of decisions, directly or indirectly affecting personnel, ranging from the dismissal of a teacher on charges of moral turpitude to permitting him or her to hold a bakesale in the cafeteria to promote an extracurricular activity. Some examples of such typical decisions gleaned at random from the minutes of the Ludlow Board of Education introduced into evidence in this case are: to permit the boosters to have a walk-a-thon and to sell ballpoint pens; to allow a civic organization to use the cafeteria for a meeting; to establish higher academic qualifications for eligibility to be a cheerleader than to be a pantherette[22] or an athlete; to permit certain administrators to detain students 45 minutes for disciplinary detention; to adopt certain textbooks; to permit the 4–H Club to use the home economics room; to establish a program for gifted students; to allow students in the choir a full credit for their participation in that activity.

Unless some practicable threshold test is devised, it is not inconceivable that a federal court action could be brought to challenge each and every one of these actions, if an invidious underlying motive for it were claimed. With regard to the plaintiff in the instant case, the minutes show that on one occasion, she was denied the privilege of going on a trip with the speech team. Could she have sued on this decision alone?[23]

The practical evils of litigation based on insubstantial injury are apparent.

"Federal courts are proper forums for the resolution of serious and substantial federal claims. They are frequently the last, and sometimes the only, resort for those who are oppressed by the denial of the rights given them by the Constitution and laws of the United States. Fulfilling this mission and the other jurisdiction conferred by acts of Congress has imposed on the federal courts a work load that taxes their capacity. Each litigant who improperly seeks federal judicial relief for a petty claim forces other litigants with more serious claims to await a day in court. When litigants improperly invoke the aid of a federal court to redress what is patently a trifling claim the district court should not attempt to ascertain who was right or who was wrong in provoking the quarrel but should dispatch the matter quickly."[24]

The cost to the school system of defending the instant action must have exceeded $10,000 at a conservative estimate, not counting the cost of the administrators and teachers being absent from school, and other indirect costs. The primary task of administrators and teachers is to teach, not spend their time in court. Conscientious administrators, teachers, and board members can be deterred from public service by the threat of lawsuits. Several of the witnesses who testified in this case had resigned from such positions in the Ludlow

22. The court is grateful the moderators of these activities did not sue, since it might find it difficult to evaluate the academic qualifications to function as a pantherette, even if it knew what a pantherette was.

23. Lest the idea that there are people who would sue as a result of such matters seem frivolous, the court notes that it read recently of a student who sued because she was ejected from the cheerleading squad because she had become too plump. Other such examples are not wanting. In *Raymon v. Alvord Independent School District*, 639 F.2d 257 (5th Cir. 1981) a student sued because three points had been deducted from a six weeks' algebra grade. In *Zamora v. Pomeroy*, 639 F.2d 662 (10th Cir. 1981) a student sued because of a disciplinary transfer to another school. In both cases it was held that the due process claims asserted were too insubstantial to be justiciable. It must be remembered in this regard that present law gives an attorney a right to claim a fee from the defendants if such an action is successful. 42 U.S.C. § 1988.

24. *Raymon v. Alvord Independent School District*, 639 F.2d at 258.

school system. Further, the concept of "chilling effect" can cut two ways, since effective decisionmaking can easily be inhibited if suits can be too freely brought by disgruntled employees.

Evaluations of a person's intent are extremely difficult to make, and can be done by a court, if at all, only after hearing voluminous evidence and with the consumption of prodigious amounts of time. It took four days of trial for the court to thread the labyrinthian ways of the Ludlow school system's scheduling process in order to reach the conclusion that this single change in plaintiff's schedule was improperly motivated.

### Showing of Likelihood of Objective "Chill" Required

■ In the present context, then, some approach preserving First Amendment principles that is yet within the realm of practicality must be formulated. A variety of possible threshold tests present themselves for consideration.

The court could, relying on the "valuable government benefit" language of *Perry v.*

*Sindermann,* require that the aggrieved public employee be able to show an actual or potential pecuniary loss from the personnel action [25] complained of. This would not be a sufficient protection against surreptitious constitutional violations.

The court could hold that all invidiously motivated personnel actions, even though only subjectively undesirable, would be actionable, with a possible *de minimis* exception. This would err in the opposite extreme and in effect install the court as a co-superintendent or co-mayor of each of the numerous school systems and cities under its jurisdiction.

Rather, this court holds that the proper test to be employed is whether the action, or pattern of actions, taken with regard to a government employee would, objectively viewed,[26] be likely to chill the exercise of constitutionally protected speech of others in a comparable position.[27] Short of this, it cannot be said that a plaintiff has suffered imposition of a "government sanction," [28] "stigma" [29] or "adverse action," [30] constituting a "cognizable legal injury." [31]

---

**25.** Throughout this discussion it is assumed that the challenged action is proximately motivated by the plaintiff-employee's First Amendment activity. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

**26.** That is, considered apart from the subjective preferences of the plaintiff.

**27.** This test is in part derived from the language of the court in *McGill v. Board of Education of Pekin Elementary School District,* 602 F.2d 774 (7th Cir. 1979). The court there implied, however, in its discussion that an action which would produce a subjective chill would be sufficient. This court holds that an objective test is required. *Cf. Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). *Laird* states as a general proposition that a person claiming a chill of First Amendment rights must, to establish a justiciable controversy show "objective harm or threat of specific future harm." In *Finley v. Hampton,* 473 F.2d 180, 185 (D.C.Cir.1972) this concept was applied to a government employee complaining of the retention of certain information in his personnel file, which he subjectively felt was adverse and which was causing him psychological distress, but which the court held was not objectively detrimental. *See also Stone v. Board*

*of Regents of the University System of Georgia,* 620 F.2d 526, 529 n. 7 (5th Cir. 1980).

The test established here observes the tenor of the language of the Supreme Court in its First Amendment employment cases. Justice Frankfurter characterized the action complained of in *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) as having "an *unmistakeable* tendency to chill" free association, 344 U.S. at 195, 73 S.Ct. at 220 (concurring opinion) (emphasis added). In *Elrod v. Burns,* 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976) the Court spoke of "a significant impairment of First Amendment rights, citing *Buckley v. Valeo,* 424 U.S. 1, 64–65, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976). And as has been pointed out, *supra, Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) referred to a "valuable government benefit."

**28.** *Cf. Finley v. Hampton,* 473 F.2d at 185.

**29.** *Id.* at 186.

**30.** *Id.*

**31.** *Id.* at 184. If plaintiff here had *alleged* only the one schedule change the court found to have been improperly motivated, the case could

This test is sufficiently flexible to preserve First Amendment values. The court is not holding that there is no conceivable schedule change or transfer that could be actionable, absent pecuniary loss, but only that the plaintiff must prove that the action or group of actions complained of would be likely, as a practical matter, to chill the exercise of First Amendment rights by his co-workers. Sometimes, a single schedule change could do so, although the court has found that is not true here. Certainly, a transfer to a different place of work, even in the same agency or system without pecuniary loss, could have such an objective chilling effect, as could the juggling of an employee's entire schedule or directing all the undesirable assignments or "dirty details" to him.

Yet, practical considerations are also satisfied by the test. First it has a built-in *de minimis* standard. And, although certainly the test does not resolve all problems of proof, the court could consider in advance complaints about actions falling short of an actual suspension or severance of employment, on a summary judgment motion,[32] thus frequently avoiding the large consumption of time necessary in attempting to evaluate people's motives. Principles of federalism are respected by the test, because the court would be intervening only where there has been a "significant" and "unmistakable" deprivation of First Amendment rights.

## CONCLUSION

For the reasons above stated, the complaint must be dismissed. A judgment to that effect has this day been entered.

have been dismissed as non-justiciable. But she alleged numerous changes which she interpreted as a demotion. Therefore, the court is dismissing the claim on the merits rather than on the basis of justiciability. *Cf.* cases in note 24, *supra*.

**32.** Or a separate trial on the issue of whether the threshold test was met could be used, if summary judgment was not appropriate.