**TENNESSEE GAS PIPELINE COMPANY, a division of Tenneco, Inc., Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

Consolidated Edison Company, Inc. of New York, Public Service Commission of the State of New York, Columbia Gas Transmission Co., Public Service Electric & Gas Co., New England Customer Group, Tennessee Natural Gas Lines, Inc., General Motors Corporation, Intervenors.

No. 77–1566.

United States Court of Appeals, District of Columbia Circuit.

Argued 23 Feb. 1979.

Decided 21 Sept. 1979.

Melvin Richter, Washington, D. C., with whom Dale A. Wright, Washington, D. C., was on the brief, for petitioner.

McNeill Watkins, II, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Howard E. Shapiro, Sol., Federal Energy Regulatory Commission, Washington, D. C., was on the brief, for respondent.

Dennis Lane, Washington, D. C., with whom Peter H. Schiff, Gen. Counsel, Public Service Commission of the State of New York, Albany, N. Y., and Richard A. Solomon, Washington, D. C., were on the brief, for intervenor Public Service Commission of the State of New York.

John D. Daly and Stephen J. Small, Charleston, W. Va., were on the brief, for intervenor Columbia Gas Transmission Corp.

William I. Harkaway, Washington, D. C., was on the brief, for intervenor Consolidated Edison Co. of New York, Inc.

Also Carl W. Ulrich, Washington, D. C., entered an appearance for intervenor Public Service Elec. and Gas Co.

Also John W. Glendening, Jr. and Paul W. Fox, Washington, D. C., entered appearances for intervenor New England Customer Group.

Also William W. Bedwell, Washington, D. C., entered an appearance for intervenor Tennessee Natural Gas Lines, Inc.

Also Edward J. Grenier, Jr., Richard P. Noland, Floyd I. Robinson and Robert W.

Clark, III, Washington, D. C., entered appearances for intervenor General Motors Corp.

Also Steven A. Taube, Atty., Interstate Commerce Commission, Washington, D. C., entered an appearance for respondent.

Also Sheila S. Hollis, Washington, D. C., entered an appearance for intervenor Public Service Commission of the State of New York.

Before ROBB and WILKEY, Circuit Judges, and RICHEY,[*] United States District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge WILKEY.

Dissenting opinion filed by Circuit Judge ROBB.

WILKEY, Circuit Judge:

Tennessee Gas Pipeline Company (Tennessee) petitions this court to vacate two orders[1] of the Federal Power Commission[2] arising from a proceeding which Tennessee maintains has become moot. The Commission found, after a hearing, that Tennessee's curtailment of natural gas deliveries occasioned by deficient pipeline capacity was unjust and unduly preferential under section 4 of the Natural Gas Act.[3] Because we are of the opinion that there no longer exists a live controversy suitable for judicial review, we vacate the subject order and remand for proceedings consistent with this opinion.

## I. BACKGROUND

### A. *Tennessee's Capacity Shortage*

Tennessee is an interstate natural gas pipeline company. Its sales of natural gas are governed by three sorts of rate schedules: Contracted Demand (CD), General Service (G), and Small General Service (GS). CD customers are those possessing alternative natural gas sources as, for example, another pipeline, local production, or underground storage. G and GS customers are without alternative sources and are commonly termed requirements customers. Although all customers were contractually entitled to purchase the maximum quantities specified in their contracts, historically only the CD customers did so; the G and GS customers purchased gas in amounts well below their entitlements. Over time, however, the actual demand of G and GS customers has grown to accommodate their increased gas resales to other purchasers. Thus, average daily G and GS demand expressed as a fraction of contractual entitlements (the so-called "load factor") increased from roughly sixty percent in 1973 to seventy-three percent in 1974.[4] In order to supply the increased demand it has been Tennessee's practice each year to seek Commission authorization to construct and operate ex-

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. The subject orders, entered in Docket No. RP74–24, were unreported: *Order Affirming and Supplementing Initial Decision* (issued 14 Mar. 1977), Joint Appendix (J.A.) at 131; and *Order Denying Rehearing* (issued 9 May 1977), J.A. at 149. The Administrative Law Judge's Initial Decision is reproduced in the Joint Appendix at 106.

2. Pursuant to the provisions of the Department of Energy Organization Act, Pub.L.No.95–91, 91 Stat. 565, 42 U.S.C.A. §§ 7101–7352 (1978), and Executive Order No. 12009, 42 Fed.Reg. 46,267 (13 Sept. 1978), the Federal Power Commission ceased to exist on 30 September 1977,

and most of its functions were transferred to the Federal Energy Regulatory Commission which, along with the Department of Energy, was activated on 1 October 1977. Section 705 of the Organization Act, 42 U.S.C.A. § 7295 (1978), provides for the substitution of the new Commission as a party in cases such as this. Throughout this opinion, the "Commission" in the context of actions taken prior to 1 October 1977 refers to the Federal Power Commission, and when used otherwise, refers to the Federal Energy Regulatory Commission.

3. 15 U.S.C. § 717c (1976).

4. Brief for Petitioner Tennessee at 3.

panded pipeline capacity. Its annual applications were based on estimates of future gas requirements furnished Tennessee by its G and GS customers.

Following its usual practice, Tennessee on 31 October 1972 applied for a certificate permitting an expansion of capacity to accommodate 1974 demand, as estimated by the G and GS customers earlier in 1972. The Commission granted the certificate in an order of 1 May 1973 in Docket No. CP73–115.[5] However, apparently concerned about Tennessee's expanding sales in a period of national shortage, the Commission had inserted a proviso that its action was "without prejudice to a final determination on the issues of the sales volumes sold through such facilities."[6] On rehearing the Commission vacated the proviso and instead instituted a new proceeding directing Tennessee to show cause why volumetric limitations should not be placed on sales to each of its customers.[7] Hearings in that proceeding commenced on 16 October 1973 and continued intermittently through January 1974.

### B. Tennessee's Curtailment Plan

The expansion authorized in the Commission's order of 1 May was completed and placed in service by the end of 1973. Meanwhile, however, Tennessee had received re-vised estimates of its G and GS customers' expected 1974 demand-estimates, some 48,000 Mcf per day over their prior estimates. In light of the revisions, Tennessee sought permission in November 1973 for further capacity expansion, without which anticipated demand could not be met.[8]

In order to handle the capacity shortfall in the event the proposed additions were not constructed, Tennessee filed tariff revisions on 28 September 1973 under which it would curtail sales of gas "[i]f for any reason whatever" it were unable to deliver its customers' requirements. Tennessee's plan was to curtail sales to various customers in accordance with a schedule of priorities ranking various end uses of the gas. The principal effect of the scheme, and the one eventually found to run afoul of section 4 of the Act,[9] was to curtail preexisting service to CD customers in order to supply the unanticipated demand of G and GS customers.

After first accepting the filing and suspending its effectiveness for one day, the Commission found that the proposed curtailment deviated only slightly from the Commission's governing policy statement and vacated the suspension.[10] Thus, "in the interests of certainty for pipeline and customer planning,"[11] the curtailment plan was permitted to become effective, in ac-

---

5. *Tennessee Gas Pipeline Co.*, Docket No. CP73–115, 49 F.P.C. 1072 (1973).

6. *Id.* at 1074.

7. 50 F.P.C. 375, 377 (1973).

8. The Commission declined to set Tennessee's application for hearing and ultimately dismissed it by order issued 30 April 1975. *See* Brief For Petitioner Tennessee at 6 n.7.

9. Order No. 467–B, 49 F.P.C. 583, *Statement of Policy Regarding Utilization and Conservation of Natural Gas Resources,* (modifying order No. 467, Docket No. R–469, 49 F.P.C. 85 (1973)), *appeal dismissed, Pacific Gas & Electric Co. v. F.P.C.,* 164 U.S.App.D.C. 371, 506 F.2d 33 (D.C. Cir. 1974). *See* 18 C.F.R. § 2.78 (1979). In order No. 467–B the Commission had established a schedule of priorities for end-uses of natural gas for the guidance of pipelines pre-paring curtailment plans for Commission approval. The occasion for the Commission's Policy Statement was the nationwide shortage of natural gas which was affecting the ability of many pipelines to meet contractual obligations. The Policy Statement contemplated, at least in the context of *supply* shortages, that pipelines would allocate short supplies among customers on the basis of the end uses of the gas. Evidently, the Commission later decided that its order No. 467–B would not govern allocations in the event of a *capacity* shortage, at least in the particular circumstances of this case.

10. *Order Amending Order and Vacating Suspension of Tariff Sheets* (issued 26 Nov. 1973), J.A. at 98.

11. *Id.* at 99.

cordance with its terms, as of 31 October 1973.

### C. The Section 5(a) Complaint Proceeding

Although Tennessee's curtailment plan ultimately became effective, it provoked numerous protests, chiefly from CD customers who thought themselves unfairly treated. The Commission responded to the continuing protest of Columbia Gas Transmission Corp., an intervenor before this court, in an order issued 7 December 1973 [12] which, while noting that the acceptance of Tennessee's filing had mooted requests that the filing be rejected or suspended, treated Columbia's protest as a complaint under section 5(a) of the Natural Gas Act and ordered a hearing to determine:

> whether curtailment by Tennessee due to its alleged lack of capacity would be unjust, unreasonable, unduly discriminatory or preferential or otherwise unlawful under the Natural Gas Act. [13]

By a subsequent order the Commission expanded the subject matter of the hearing to include:

> what effect Tennessee's implementation of its curtailment plan due to lack of capacity, or otherwise, will have on its customers and their customers and whether modifications should be made in Tennessee's curtailment plan and/or its implementation. [14]

Thus by early December 1973 the Commission had begun two proceedings with respect to Tennessee's practices: (1) the inquiry into the advisability of volumetric limitations on sales, and (2) the section 5(a) complaint proceeding concerning the curtailment plan. It is the Commission's deci-

sion in the latter proceeding that is the subject of the instant petition.

### D. Tennessee's Invocation of the Curtailment Plan

On 27 December 1973 Tennessee advised its customers that it would begin curtailing gas sales in accordance with its filed plan. Under that plan, as we have noted, reductions depended on the priority of the end use of the gas and were in practice confined to a cutback of roughly sixty percent of the lowest priority sales. [15] In consequence, approximately one-half of the curtailment was incurred by CD customers and the balance by G customers. Tennessee continued to curtail sales through September 1974, at which time its capacity shortage was superseded by a general gas *supply* shortage.

### E. Opinion No. 712 and the Imposition of Volumetric Controls

On 26 November 1974 the Commission affirmed an initial decision in the volumetric limitations proceeding which found that controls on Tennessee's sales, fixed for each customer at the level of its originally estimated 1974 demand, would for a variety of reasons be in the public interest. [16] In imposing volumetric limits, the Commission did not address the lawfulness of Tennessee's curtailment plan either generally or as recently applied in the circumstances of the capacity shortage. Moreover, the Commission emphasized that the controls were temporary, meant only "to freeze growth pending subsequent Commission action." [17]

### F. Decisions in the Section 5(a) Proceeding

Following public hearings, the Administrative Law Judge issued an Initial Decision

---

12. *See id.* at 101.

13. *See id.* at 103.

14. *See id.* at 107–08.

15. *See* Brief for Commission at 7–8 n.7.

16. Opinion No. 712, *Tennessee Gas Pipeline Co.*, Docket Nos. CP73–115, CP74–27, 52 F.P.C. 1459 (1974), *aff'd, Berkshire Gas Co. v. FPC,* 174 U.S.App.D.C. 241, 530 F.2d 1093 (D.C. Cir. 1976) (per curiam).

17. 52 F.P.C. at 1479.

on 9 July 1975 [18] concerning the lawfulness of Tennessee's curtailment plan. The ALJ concluded that Tennessee's use of the plan in the context of a capacity shortage violated section 4(b) of the Act by unduly preferring the G and GS customers. The ALJ declined, however, to order the "payback" of wrongfully withheld sales, finding such relief inappropriate on due process grounds. The Commission affirmed the Initial Decision in all pertinent respects on 14 March 1977.[19] It rejected Tennessee's argument that the issue of the plan's lawfulness as applied to *capacity* shortages had become moot and had accordingly not been properly before the Commission for adjudication. While conceding that the matter was in one sense moot in light of the volumetric limita-

tions imposed in Opinion No. 712 and the intervening *supply* shortage,[20] the Commission was nevertheless of the view that it "ha[d] the right to let stand a determination *that will act as precedent*" to preclude Tennessee's again engaging in "an unjust and unreasonable practice which Tennessee maintains is permissible."[21]

Tennessee brought the instant petition seeking to have the finding that it violated section 4(b) vacated as moot or, alternatively, set aside as arbitrary and unsupported by the record. Inasmuch as we agree that the controversy has become moot, we have no occasion to review the substantive correctness of the order, but merely set it aside.

---

**18.** *See* J.A. at 109.

**19.** *See Id.* at 131. The Commission affirmed the ALJ's rejection of "payback" relief on grounds that § 5 permits only prospective remedies. *See Id.* at 141. Also, while the ALJ had noted the argument that Tennessee had violated § 7(a) of the Act, 15 U.S.C. 717f(a), by expanding service to one class of customers at the expense of existing service to another, *see Granite City Steel Co. v. FPC*, 115 U.S.App. D.C. 392, 320 F.2d 711 (D.C. Cir. 1963), the Commission specifically rejected the argument. *See* J.A. at 140.

**20.** The Commission stated with respect to Tennessee's claim of mootness:

> Due to the unique procedural stance of this proceeding, the finding approved above does not have any real impact upon Tennessee and its customers. This segment of RP74–24 arose from Columbia's protest to Tennessee's capacity curtailment, but, since the Commission had already accepted Tennessee's curtailment plan without suspension (50 FPC 1658), Columbia's protest was considered a complaint under Section 5(a) of the Natural Gas Act. All of this means that our present ruling is given prospective effect only; however, since Tennessee has been implementing its curtailment plan since September 22, 1974, solely due to a supply shortage, *supra* note 5, the issue of capacity curtailment is completely moot since that date.

J.A. at 140–41.
Interesting enough, following the issuance of an Initial Decision in the volumetric limitations proceeding, Intervenor Columbia proposed that the § 5(a) proceeding be abandoned inasmuch as the Initial Decision, if sustained by the Com-

mission, "would moot the issue raised by Columbia in this proceeding; and could well obviate the need for the Presiding Judge in this proceeding to decide the issue raised by Columbia's so-called complaint." The ALJ in the instant proceeding rejected Columbia's suggestion on 7 August 1974. *See Initial Decision, Id.* at 113.

**21.** *Order denying rehearing*, J.A. at 151 (emphasis added).

> While it is true that, in terms of possible remedies for the complaints herein, the issue is moot, it is not moot in all respects. Clearly Tennessee actively defended its right to use the curtailment plan for capacity deficiency during every stage of this proceeding and long after it had stopped that practice. Without this Commission finding that such use of its curtailment is unjust and unreasonable, Tennessee could possibly reinstitute capacity curtailment in order to permit load growth. As shown above, it certainly retains its conviction that it can do just that. Accordingly, the issue is not moot to the extent that the Commission has the right to let stand a determination that will act as precedent to preclude Tennessee from reinstituting an unjust and unreasonable practice which Tennessee maintains is permissible. Tennessee cannot be permitted to vitiate the fruits of this entire proceeding with its inappropriate claim of mootness so as to be free at some future date to begin capacity curtailment anew, forcing its aggrieved customers and the Commission to the task of another Section 5 investigation.

*Id.* (footnotes omitted).

## II. ANALYSIS

Tennessee argues here, as it did before the Commission, that the controversy over its curtailment practices had been mooted prior to the issuance of the subject orders, allegedly by three circumstances. First, Tennessee had ceased curtailing gas sales in response to its *capacity* shortfall when in September 1974 that shortfall was superseded by a gas supply *shortage* of indefinite duration. Second, in Opinion No. 712 the Commission had limited Tennessee's sales to the original estimates of 1974 demand, for which existing capacity was ample. Third, a private agreement, later approved by the Commission, which settled various matters within the section 5(a) proceeding apparently precludes Tennessee from again practicing *capacity* curtailment without Commission approval and in any event before 1 November 1980.[22] In these circumstances, Tennessee maintains "the allegedly wrongful behavior could not reasonably be expected to recur."[23] Not only would the natural gas shortage have to end, but also the Commission would have to release Tennessee from Opinion No. 712 and the settlement agreement. The Commission argues, on the other hand, that since these things may occur the controversy is live enough to save the Commission's declaratory order from arbitrariness and that, in any event, since the Commission is not an article III court it is not governed by the mootness doctrine.

### A. *The Mootness Doctrine in Administrative Law*

■ Federal courts' refusal to hear moot cases was initially grounded in the common-law doctrine that courts lack power to decide abstract questions in cases where no dispute exists.[24] In recent years, however, the prudential rule has been raised to constitutional proportion, based specifically on the case or controversy requirement of Article III.[25] A matter is thus not within the federal judicial power if there is not "a present, live controversy of the kind that must exist if [a court is] to avoid advisory opinions on abstract propositions of law."[26] Partly the case or controversy requirement preserves the separation of powers by "assur[ing] that the federal courts will not intrude into areas committed to the other branches of government."[27] A second and more familiar purpose is to "limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process."[28]

■ Judicial review of administrative action, like all exercises of the federal judicial power, is circumscribed by the requirement that there be an actual controversy. Accordingly, we have no jurisdiction over suits challenging administrative orders which are moot.[29] Concededly the concept of mootness is placed under some strain in the context of administrative orders whose for-

---

22. *See* Brief for Petitioner Tennessee at 16; *Order Denying Rehearing*, J.A. at 151 n.4.

23. Brief for Petitioner Tennessee at 20 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)).

24. *See Mills v. Green*, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895); *California v. San Pablo & T.R.R.*, 149 U.S. 308, 314, 13 S.Ct. 876, 37 L.Ed. 747 (1893); Note, *The Mootness Doctrine in the Supreme Court*, 88 Harv.L.Rev. 373, 374 (1974).

25. U.S.Const., art. III; *see Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964); *Sibron v. New York*, 392 U.S. 40, 57, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

26. *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). *See also SEC v. Medical Comm. for Human Rights*, 404 U.S. 403, 407, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972).

27. *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968).

28. *Id.*

29. *See Brooklyn Union Gas Co. v. FERC*, 188 U.S.App.D.C. 13, 15, 575 F.2d 894, 896 (D.C. Cir. 1978); *Relf v. Weinberger*, 184 U.S.App.D.C. 147, 152, 565 F.2d 722, 727 (D.C. Cir. 1977); *Boston Community Media Comm. v. FCC*, 166 U.S.App.D.C. 183, 184, 509 F.2d 516, 517 (D.C. Cir. 1975); *Louisiana v. FPC*, 503 F.2d 844, 863 (5th Cir. 1974); *Alton & So. Ry. Co. v. International Ass'n of Mach. & A.W.*, 150

mal legal effect is typically shortlived. It would be perverse were the decision of important continuing controversies defeated, as it would be by an overnarrow application of the doctrine, in cases of "short term orders, capable of repetition, yet evading review."[30] In fact, the law quite sensibly finds such cases justiciable, despite the fact that mootness, even in the constitutional sense, consequently appears more a discretionary exercise of judicial restraint than a bright line jurisdictional prerequisite. Still and all, even a somewhat unpredictable case by case approach to justiciability is a far cry from concluding, as the Commission apparently does, that the mootness doctrine is irrelevant to judicial review of administrative agencies.

 The limitations imposed by article III on what matters federal courts may hear affect administrative agencies only indirectly. The subject matter of agencies' jurisdiction naturally is not confined to cases or controversies inasmuch as agencies are creatures of article I. Though agencies must act without arbitrariness, and perhaps the arbitrariness standard may beyond some distant point confine the business of agencies in a manner remotely akin to article III, still agencies are generally free to act in advisory or legislative capacities. While this is obvious in the case of rulemaking, it is also true where an agency proceeds via traditional adjudicatory forms of decision. Thus the Commission correctly observes that an agency may, if authorized by statute, issue an advisory opinion or abstract declaration without regard to the existence of an actual controversy. The Ad-

ministrative Procedure Act expressly permits such practices:

> The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy *or remove uncertainty.*[31]

Moreover, we have no quarrel with the proposition that the Commission may generally proceed in such a fashion in matters arising under the Natural Gas Act and see no reason why a proceeding under section 5(a) of the Act would not be the appropriate occasion for such a declaration. Our disposition of the instant petition depends simply on the peculiar, uncertain limbo from which we feel obliged to remove the subject orders.

### B. *The Mootness of the Present Case*

 We briefly recall a few relevant facts. As the Commission convened the section 5(a) complaint proceeding Tennessee was about to begin curtailing sales, because of capacity limitation, in accordance with its filed plan. The Commission had accepted the plan with only a one-day suspension, as it was completely free to do. Alternatively, of course, the Commission might have suspended the filing and begun an investigation under section 4 of the Act, a course which could have afforded Tennessee's customers compensatory relief in the event the plan were invoked and later found unlawful.[32] Having declined to do so, the Commission was remitted to a section 5(a) proceeding whose legal effects were wholly prospective.[33]

 The proceeding as begun was thus closely analogous to an action for a declara-

---

U.S.App.D.C. 36, 40–46, 463 F.2d 872, 876–82 (D.C. Cir. 1972); *Mechling Barge Lines v. United States*, 368 U.S. 324, 328–30, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961).

30. *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). *See also Nader v. Volpe*, 154 U.S.App. D.C. 332, 333–334, 475 F.2d 916, 917–18 (D.C. Cir. 1973); *Alton & So. Ry. Co.*, 150 U.S.App. D.C. at 42–44, 463 F.2d at 878–80.

31. Administrative Procedure Act § 5(e), 5 U.S.C. § 554(e) (1976) (emphasis added).

32. *See* 15 U.S.C. § 717c(e) (1976).

33. *See FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 618, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Atlantic Refining Co. v. Public Service Comm'n*, 360 U.S. 378, 389, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

tory judgment through which certain threatened practices would be found lawful or unlawful. Originally confined to the lawfulness of the curtailment plan as applied to Tennessee's capacity shortfall, the hearing was expanded to embrace curtailment under any circumstances. Lastly, just before the hearings were begun Tennessee invoked its plan. As a consequence, the proceeding assumed a character which from the start made it rather likely to be mooted: its purview was limited to the lawfulness of the curtailment plan as applied to particular historical circumstances. With the dissipation of those circumstances there ceased to be a live controversy between the parties, and without some reasonable probability that the controversy will recur, we follow the customary practice of declining review.[34]

This case is, to be sure, not entirely typical of those in which administrative orders are found moot. Ordinarily a mooted order at least will have lapsed by its own terms [35] or will have addressed a matter which has formally passed from legal existence, as for example, a voided contract.[36] In the instant case, as the Commission observes, there remain both an operative final order and an effective tariff filing containing the curtailment plan which could be invoked "[i]f for any reason whatever" Tennessee were unable to meet demand. Still despite the formal inconsistency, we think the recurrence of capacity curtailment, particularly under circumstances like those on which the Commission's order depended, unlikely enough that the case is moot in the true sense.

The liveliness of a controversy depends in no small measure on its factual generality, at least where, as here, all of the order's legal incidents alleged to save it from mootness are prospective. The specificity of the finding in the instant proceeding would, in the present posture of the case, make it moot even were it more likely that *some* sort of capacity shortage again would arise. The closely factual nature of the Commission's findings is apparent in the ALJ's rationale, which the Commission affirmed:

> There is no valid reason for finding that the G and GS customers are entitled to the gas in question. They had been put on notice that [Tennessee] might not be permitted to serve further increases; they then attached or made commitments to attach loads with that knowledge in hand.[37]

Evidently a valid objection to curtailment in the future would depend on another finding of fair notice. It would seem less than judicious to review the correctness of the factual finding in this case merely to preserve the Commission's antidiscrimination principle as a judicial precedent. This is precisely the sort of advisory opinion against which the mootness doctrine sets its face, as we do ours.

Both the Commission and our dissenting colleague argue that Tennessee's plan "remains on file with the Commission; and absent an order striking it down it may be invoked by Tennessee in the future," [38] and that Tennessee will "be free at some future date to begin capacity curtailment anew,

---

**34.** *See* note 29 *supra.*

**35.** *See, e. g., Southern Pacific Terminal Co. v. ICC,* 219 U.S. at 515, 31 S.Ct. 279; *Alton & So. Ry. Co.,* 150 U.S.App.D.C. at 41–45, 463 F.2d at 877–81.

**36.** *E. g., Boston Community Media Comm.,* 166 U.S.App.D.C. at 184, 509 F.2d at 517 (FCC order disapproving an agreement in connection with the assignment of a radio broadcast license became moot when parties abandoned plans to complete assignment); *Louisiana v. FPC,* 503 F.2d at 863 (issue as to the lawfulness of natural gas curtailment plans became moot when plans were abandoned).

**37.** *Initial Decision,* J.A. at 124. Likewise in denying rehearing the Commission emphasized that its "rejection of Tennessee's capacity curtailment must be read in the context of this case, to-wit, Tennessee's capacity deficiency arose from its permitting the G/GS customers to increase their requirements." *Order Denying Rehearing, id.* at 152.

**38.** Dissent op.`197 U.S.App.D.C. ——, 606 F.2d 1385.

forcing its aggrieved customers and the Commission to the task of another Section 5 investigation." [39]

■ This is just exactly what we think due process requires. If the gas supply situation drastically changes, and Tennessee decides to make effective even the identical plan of capacity curtailment filed, the new factual situation would still call for inquiry and hearing. Actually, it is more likely that Tennessee would desire to implement a plan differing in some details from that of 1973, to deal with a different fact situation, and would be confronted by a legal controversy as to whether the previous Commission decision should or should not apply as a precedent to a new fact situation. These reasons counsel vacating the previous order, now moot and only conceivably applicable to a changed situation, with the Commission having its full right and duty to launch a section 5 inquiry if and when a changed situation and new action by Tennessee requires. [40]

## C. *The Disposition of the Case*

■ The Commission [41] and an intervenor [42] before this court, proposed, in the event we found the case nonjusticiable, that the petition for review be dismissed without disturbing the subject orders. They reasoned that if in fact review would be without practical effect, petitioner was not "ag-

grieved" within the meaning of the judicial review provisions of the Natural Gas Act [43] and we were without jurisdiction. The argument is without merit. The Supreme Court prescribed the appropriate disposition of moot administrative orders in *Mechling Barge Lines v. United States* : [44]

In *United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36, this Court expressed the view that a party should not be concluded in subsequent litigation by a District Court's resolution of issues, when appellate review of the judgment incorporating that resolution, otherwise available as of right, fails because of intervening mootness. We there held that that principle should be implemented by the reviewing court's vacating the unreviewed judgment below. We think the principle enunciated in *Munsingwear* at least equally applicable to unreviewed administrative orders, and we adopt its procedure here. [45]

We follow the course set out in *Munsingwear* and *Mechling* and, accordingly, vacate the order which we decline to review. A different result likely would affect petitioners harshly. The Commission is of the view that, if its orders were permitted to stand and the curtailment plan were again invoked, Tennessee would be "subject to injunction, mandamus, and the risk of criminal prosecution." [46] We think it would be unfair to leave Tennessee thus under the

---

**39.** *Id.* 151, quoted in dissent op. 1384.

**40.** Our dissenting colleague adds the argument that this moot order can be infused with life by treating it as a "declaratory order" under 5 U.S.C. § 554(e). The order was not promulgated as the result of a declaratory proceeding. Obviously, if every moot administrative order could be saved by terming it "declaratory," the doctrine of mootness would be extinct in administrative law. Neither the Supreme Court nor our court has found it so.

Section 554(e) could not be applicable here, anyway. There is no existing "controversy," as the Commission itself admits. The only "uncertainty" is caused by the Commission's attempt to prolong the life of its moot order and that "uncertainty" this court removes by vacating the order.

**41.** *See* Brief for Commission at 24–25.

**42.** *See* Brief for Intervenor Columbia Gas Transmission Corp. at 21–22.

**43.** Natural Gas Act § 19(b), 15 U.S.C. § 717r(b) (1976).

**44.** 368 U.S. 324, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961).

**45.** *Id.* at 329, 82 S.Ct. at 340–341 (footnote omitted).

**46.** Brief for Commission at 24.

pall of an unreviewed administrative order, particularly if there were no assurance that judicial review would ultimately be available other than in an enforcement proceeding.

Moreover, even though we think that the controversy will not be rekindled, equally we set aside the Commission's orders to assure they do not collaterally affect other matters arising from the past curtailment. Indeed, one intervenor argued that the instant case is not moot precisely because of its likely effect on "causes of action which are not before this Court." [47] Of course, the rationale of the *Munsingwear* doctrine is the avoidance of just such conclusive effects, whether of a district court judgment or an agency order.

Finally, we are satisfied that the public interest as conceived by the Commission will not suffer by the finding of mootness in this case. First, with respect to Tennessee's customers, sales are to be governed by the nondiscriminatory allocation existing in 1974 pending Commission action. Any curtailment below the 1974 levels occasioned by a *supply* shortage will presumably be in accordance with the settlement agreement and various other orders arising in this proceeding, none of which are before this court for review. If, in the meantime, the Commission determines that a recurrence of a capacity shortage is likely, it is of course free to conduct rulemaking or a declaratory adjudication concerning circumstances as they appear at that time. Without meaning to narrow the Commission's discretion, we will observe that rulemaking would appear to well serve its interest in deriving a general prescription in this field. The notice and comment procedure, for example, would assure a fair measure more adversariness than ordinarily accompanies the pursuit of moot adjudications.

With respect to other pipelines' customers there would similarly appear no prejudice. An anticipatory rulemaking would naturally preclude the filing or implementation of tariffs proposing unlawful practices. Alternatively, the Commission may choose to rely entirely on its suspension and investigation authority under section 4 of the Act in the event a pipeline files an arguably unlawful tariff, in which case the Commission would hopefully conclude its investigation before the end of the five-month suspension period, or at least make provision for later compensatory relief from a tariff which it permits to become effective.

## III. CONCLUSION

We are of the opinion that this controversy has become moot. Accordingly, we vacate the orders under review insofar as they hold that petitioner's curtailment practices were in violation of section 4(b) of the Natural Gas Act and remand the case to the Commission for disposition consistent with this opinion.

*So ordered.*

ROBB, Circuit Judge, dissenting:

The question presented to this court for decision is perhaps obscured by the complexity of the proceedings before the Commission—proceedings which the majority says created a "peculiar uncertain limbo". When the essential facts of the case are considered, however, I think both the issue and the answer become plain.

On September 28, 1973 Tennessee filed a capacity curtailment plan to be effective October 31, 1973. On October 19, 1973 Columbia protested the filing upon the ground that the proposed curtailment on the basis of capacity limitations rather than because of supply shortage was unjust, unreason-

---

**47.** Brief for Intervenor Consolidated Edison Co. of New York, Inc. at 10. The relationship between the Commission's jurisdiction over curtailment plans filed as tariffs and civil litigation based on private contractual claims poses difficult questions about which we intimate no

view. *See Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 532 F.2d 412 (5th Cir. 1976). *See also Marine Engineers Beneficial Ass'n v. Interlake S.S. Co.*, 370 U.S. 173, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962).

able or unduly discriminatory. Nevertheless the plan became effective October 31, 1973.

By order issued December 7, 1973 the Commission treated Columbia's protest as a complaint under section 5(a) of the Natural Gas Act, 15 U.S.C. § 717d(a) and granted Columbia's request for formal hearings. Hearings were held before Presiding Judge Lande in January and February 1974. This proceeding was Docket No. RP74–24.

On July 22, 1974, in another proceeding known as Docket Nos. CP73–115 and CP74–27, and before any decision issued in Docket No. RP74–24, Presiding Judge Morse issued his initial decision in which he concluded that volumetric annual limitations for Tennessee's customers would be appropriate. On November 26, 1974, by Opinion No. 712, the Commission adopted Judge Morse's decision. Rehearing was denied January 17, 1975.

Tennessee applied its curtailment plan based on capacity limitations until September 22, 1974. Thereafter it applied a curtailment plan based solely on supply shortage.

On July 9, 1975, in Docket No. RP74–24, the proceeding on Columbia's complaint, Presiding Judge Lande issued his initial decision. He concluded that Tennessee's capacity curtailment plan was improper, because it curtailed CD customers in order to deliver gas to G and GS customers. He found this to be preferential treatment in violation of section 4(b) of the Natural Gas Act, 15 U.S.C. § 717c(b). On March 14, 1977 the Commission affirmed Judge Lande's ruling. Speaking of the practical effect of this decision on Tennessee and its customers the Commission said:

> Due to the unique procedural stance of this proceeding, the finding approved above does not have any real impact upon Tennessee and its customers. . . . All of this means that our present ruling is given prospective effect only; however, since Tennessee has been implementing its curtailment plan since September 22, 1974, solely due to a supply shortage, . . . the issue of capacity curtailment is completely moot since that date. (J.A. 140, 141)

Tennessee sought rehearing of the Commission's order, arguing, among other things, that because the capacity curtailment issue was moot, the Commission should vacate its finding with respect to that issue. The Commission denied rehearing, May 9, 1977, reasoning that:

> While it is true that, in terms of possible remedies for the complaints herein, the issue is moot, it is not moot in all respects. Clearly Tennessee actively defended its right to use the curtailment plan for capacity deficiency during every stage of this proceeding and long after it had stopped that practice. Without this Commission finding that such use of its curtailment is unjust and unreasonable, Tennessee could possibly reinstitute capacity curtailment in order to permit load growth. As shown above, it certainly retains its conviction that it can do just that.[3] Accordingly, the issue is not moot to the extent that the Commission has the right to let stand a determination that will act as precedent to preclude Tennessee from reinstituting an unjust and unreasonable practice which Tennessee maintains is permissible. Tennessee cannot be permitted to vitiate the fruits of this entire proceeding with its inappropriate claim of mootness so as to be free at some future date to begin capacity curtailment anew, forcing its aggrieved customers and the Commission to the task of another Section 5 investigation.[4]

[3] In fact Tennessee reasserted the correctness of capacity curtailment in its application for rehearing by attaching its brief on exceptions on that point.

[4] Under the curtailment settlement approved by the Commission in Docket No. RP75–50 by order of February 28, 1977, Tennessee would be barred from any such reinstitution of capacity curtailment until November 1, 1980.

(J.A. 151) On this appeal from the Commission's orders in Docket No. RP74–24 Ten-

nessee repeats its argument that the order with respect to the capacity curtailment plan should be vacated as moot. Tennessee also argues that this curtailment plan was reasonable and proper.

The majority holds that the challenge to Tennessee's capacity curtailment plan was mooted when the Commission by Order No. 712 ordered the imposition of volumetric limitations on Tennessee's customers. I do not agree.

Tennessee's capacity curtailment plan provides that it may be invoked "[i]f for any reason whatever" Tennessee is unable to meet customer demands. Opinion No. 712 did not consider the validity of this plan. Accordingly, although the plan has been replaced by curtailment because of supply shortage, it remains on file with the Commission; and absent an order striking it down it may be invoked by Tennessee in the future. Moreover, the initial decision of Presiding Judge Morse in Docket Nos. CP73–115 and CP74–27 and Opinion No. 712 affirming this decision, emphasized that the volumetric limitations imposed by that decision were temporary.[1] Under these circumstances I think the Tennessee curtailment plan has, and will continue to have, vitality in the absence of a final decision declaring it invalid. I agree with the Commission that it "has the right to let stand a determination that will act as precedent to preclude Tennessee from reinstituting an unjust and unreasonable practice which Tennessee maintains is permissible." (Op. denying Rehear. in Docket No. RP74–24) (J.A. 151)

There is an additional reason why the case is not moot, even though the Commission's order has no present impact on Tennessee's plan and Columbia's complaint. The Administrative Procedure Act, 5 U.S.C. § 554(e) (1976) expressly provides that

> The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty.

Thus, the Commission's order may properly stand as a declaratory order with respect to the validity of Tennessee's curtailment plan.

I would hold that this case is not moot. I would reach the merits, and affirm the Commission's order.

---

1. A settlement agreement upon which Tennessee relies (Br. P. 16) expires in 1980.